583 So.2d 1169 (1991)
Lynn David GALLOWAY, et al.
v.
BATON ROUGE GENERAL HOSPITAL and ABC Insurance Company.
No. 90 CA 0314.
Court of Appeal of Louisiana, First Circuit.
June 27, 1991.
Rehearing Denied September 4, 1991.
*1170 Leslie J. Schiff, Lafayette, for plaintiffs-appellants Lynn David Galloway and Gary Galloway.
Felix R. Weill, Baton Rouge, for defendant-appellee Baton Rouge Gen. Hosp.
Before COVINGTON, C.J., and LOTTINGER, SHORTESS, CARTER and LeBLANC, JJ.
LOTTINGER, Judge.
This is an appeal from a trial court judgment in favor of the defendants and against the plaintiffs dismissing their claim for damages in a medical malpractice suit.

FACTS
Ora Fay Galloway was admitted to Baton Rouge General Hospital on August 20, 1979, for surgery. On August 21, 1979, Dr. Anthony S. Ioppolo, a neurosurgeon, performed a C4-5 discectomy and a C5-6 anterior cervical fusion and decompression. The surgery was completed at 5:00 p.m., and Mrs. Galloway was taken from the operating room to the recovery room, where she remained under observation by the hospital staff and nurses for about two hours.
Thereafter, Mrs. Galloway was discharged from the recovery room and brought to her floor room at about 7:15 p.m. While in her floor room, she experienced breathing problems caused by bleeding at or near the surgical site. Mrs. Galloway went into respiratory arrest at approximately 8:00 p.m. The hospital personnel responded immediately and performed emergency procedures. However, despite all efforts, Mrs. Galloway went into cardiac arrest and subsequently went into a coma, from which she did not recover. She died approximately one week later.
The plaintiffs[1] subsequently instituted proceedings with a medical review panel against Baton Rouge General Hospital, a qualified health care provider, as required by the Louisiana Medical Malpractice Act, *1171 LSA-R.S. 40:1299.41 et seq. In due course, based on the documentary evidence presented, the panel rendered its opinion favorable to the plaintiffs on January 19, 1982, as follows: "The evidence supports the conclusion that defendant, Baton Rouge General Hospital failed to comply with appropriate standards of care as charged in the complaint."[2]
On March 8, 1982, the plaintiffs filed suit against the hospital, and the case was tried before Judge Frank Foil on August 23, 1983, ending in a mistrial.[3] The case was then transferred to a different division and was tried before Judge Carl A. Guidry on May 1, 1984. The matter again ended in a mistrial. Finally, the case was tried before Judge William Brown on September 5-6, 1989. Following this trial, the court, for written reasons assigned, rendered judgment in favor of the defendant and against the plaintiffs.
The plaintiffs appealed raising the following issues:
1. Did the trial court err in refusing to admit the prior testimony of Drs. Ioppolo, Poche and Hanchey (both trial and deposition) as substantive proof of plaintiffs' case?
2. Did the trial court err in holding that plaintiffs did not carry their burden of proof to show that the conduct of the hospital and its employees failed to comply with the appropriate standard of care owed its patient, Mrs. Galloway?

EXCLUSION OF PRIOR DEPOSITIONS AND TRIAL TESTIMONY AS SUBSTANTIVE PROOF OF PLAINTIFFS' CASE
Plaintiffs complain that the trial court erred in refusing to admit the prior depositions and trial testimony of Dr. A.S. Ioppolo, Dr. James Poche, and Dr. Robert Hanchey as substantive proof of plaintiffs' case. We find no merit in this complaint.
The record reflects that the testimony of the three doctors was taken in open court before the trial judge as part of the bench trial. After Dr. Ioppolo's testimony on direct, counsel for plaintiffs offered Dr. Ioppolo's prior trial testimony as "substantive proof of its contents." The trial judge refused to allow the introduction of Dr. Ioppolo's prior court testimony for "direct purposes." However, the trial judge indicated that such testimony could be used for "impeachment purposes." Counsel for plaintiffs declined to offer the testimony for such purposes, but proffered such testimony. After examining Drs. Poche and Hanchey, counsel for plaintiffs made similar requests regarding their prior deposition and trial testimony. The same rulings were made as to the prior testimony and deposition of Dr. Hanchey and Dr. Poche.[4]
These rulings of the trial court were governed by LSA-C.C.P. art. 1450,[5] which at the time of trial provided, in pertinent part:
A. At the trial ... any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence, applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness.
....
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
(a) That the witness is unavailable, or

*1172 (b) Upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.
To be admissible at the trial, two tests must be met. First, it must be admissible under the Louisiana Code of Evidence and, second, the use of the deposition must fit one of the specific provisions of LSA-C.C.P. art. 1450.
Since plaintiffs' counsel did not choose to use the depositions for contradictory or impeachment purposes, LSA-C.C.P. art. 1450 A(1) is inapplicable. Since the three witnesses in question were available to testify and did, in fact, testify, LSA-C.C.P. art. 1450 A(3)(a) is inapplicable.
Plaintiffs rely on former LSA-C.C.P. art. 1450 A(3)(b) to support their contention that the trial judge erred in refusing to allow the prior testimony and depositions to be admitted as substantive proof.
This paragraph specifically provides that the party seeking to use the prior testimony must show that "such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used."
We do not find that the "interest of justice" would be best served by accepting the prior testimony and depositions as substantive proof that the hospital departed from the standard of care in the postoperative care of Mrs. Galloway. This holding is brought into proper focus when we consider the trial judge's reasons for judgment, in pertinent part:
The medical review board comprised of Drs. Lohmann, Hanchey and Poche originally found that the Baton Rouge General failed to comply with appropriate standards of care as charged. Subsequently, each of the physicians retracted their prior finding and at trial suggest that there was not any evidence that would have put any of the nurses on notice that Mrs. Galloway was suffering from internal bleeding that would cause respiratory problems. Dr. Flynn, Dr. Berry and even Dr. Walters agreed that no one can predict when significant symptoms will manifest themselves when there is internal bleeding. All of Mrs. Galloway's critical signs (blood pressure, pulse and breathing) were normal until immediately before ... Mrs. Galloway's inability to breathe.
The trial judge was fully aware that each of the three members of the medical review panel had changed their opinions and had retracted their prior findings. The refusal to allow the prior testimony and depositions in evidence for the purpose offered did not defeat the interest of justice. Therefore, we find that the depositions and/or prior trial testimony of Drs. Ioppolo, Hanchey, and Poche were properly excluded.
In their original brief, plaintiffs rely on Stewart v. Zurich Insurance Company, 342 So.2d 1273 (La.App. 4th Cir.1977), as authority for considering the proffered evidence and deciding the case as a trial de novo in light of the prior trial testimony and depositions. In Stewart, the appellate court found that certain evidence which was in the record through proffer had been erroneously excluded. The Stewart case is not controlling as to our decision in the case sub judice, since we have ruled that the proffered evidence was properly excluded for the purposes offered.
In addition, plaintiffs supplemented their original brief citing Buckbee v. United Gas Pipe Line Company, Inc., 561 So.2d 76 (La.1990). In Buckbee, the supreme court found that the trial court erred in excluding testimony of a co-employee (to whom the decedent had said he was going to seek permission of his superior to use heat to extract a plug from a coil on a used crude petroleum heater) was admissible as an exception to the hearsay rule to show the speaker's out-of-court declaration of intent. Buckbee, however, is inapposite to the instant case. Herein, the exclusion of the evidence was not based on hearsay *1173 grounds, and the evidence was properly excluded by the trial judge for the reasons stated above.

FAILURE OF PLAINTIFFS TO CARRY THEIR BURDEN OF PROOF
On this issue, the trial judge stated:
This Court does not find that plaintiffs have carried their burden of proof, that the conduct of the employee(s) of the Baton Rouge General constituted a breach of the duty owed.
In a medical malpractice action against a hospital, the plaintiffs must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury. Further, a hospital is bound to exercise the requisite amount of care that the particular patient's condition may require and to protect the patient from external circumstances peculiarly within the control of the hospital. The facts and circumstances of each particular case determines whether a hospital has breached its duties. Smith v. State, Department of Health and Human Resources Administration, 523 So.2d 815, 819 (La.1988). The mere fact that an injury occurs or an accident happens raises no presumption or inference of negligence on the part of the hospital. Berry v. Rapides General Hospital, Inc., 527 So.2d 583, 585 (La.App. 3rd Cir.1988).
In the instant case, the evidence shows that Mrs. Galloway was admitted to the hospital on the evening of August 20, 1979, for a C4-5 discectomy, and C5-6 anterior cervical fusion and decompression. Dr. Ioppolo performed the surgery on the following day from 3:00 p.m. to 5:00 p.m. Following surgery, Mrs. Galloway was taken to the recovery room, accompanied by Dr. Lillian Wills, the anesthesiologist. Dr. Wills testified, by prior trial testimony and deposition, that between 5:00 p.m. and 7:00 p.m., Mrs. Galloway was extubated (removal of the endotracheal tube) and given oxygen.
According to Dr. Wills, she saw Mrs. Galloway two or three times while in the recovery room. At those times, Mrs. Galloway appeared to be doing well, her color was good, there was no abnormal swelling, and there was no respiratory difficulty. Mrs. Galloway asked about other patients in the recovery room. Dr. Wills described Mrs. Galloway's stay in the recovery room as "non-eventful."
Nurses Winkler, LaRochelle and Masey cared for Mrs. Galloway in the recovery room, closely monitoring her during her stay in the recovery room. Winkler was assigned the primary care of Mrs. Galloway. Pursuant to Dr. Ioppolo's orders, Winkler checked the patient's blood pressure, pulse, and respiratory rate at fifteen minute intervals. She also checked the dressings on Mrs. Galloway's neck and hip. During the time Mrs. Galloway was in the recovery room, Winkler observed no swelling. The strength in Mrs. Galloway's arms and legs was also checked every fifteen minutes. All of Mrs. Galloway's vital signs remained stable during her recovery room stay. Dr. Ioppolo described Mrs. Galloway's condition in the recovery room as "very well."
After two hours, the charge nurse, Nurse Masey, examined Mrs. Galloway to see if she was ready to be released to her floor room. Masey found Mrs. Galloway to be awake and oriented. Her vital signs were normal. There was no swelling in the neck, and her breathing and color were good. She exhibited good strength in her arms and legs. Masey performed the standard test to determine whether Mrs. Galloway could be discharged from the recovery room and taken to a floor room. The test results revealed that Mrs. Galloway's condition was favorable for transfer to her floor room.
While Masey was preparing the discharge notes, Mrs. Galloway complained of a tickle in her throat and a tightness of the soft collar. Masey again checked for swelling and had the patient take a deep breath and clear her throat. The patient was able to do this without difficulty. There was no hoarseness or raspiness in her voice.
*1174 At 7:15 p.m., Mrs. Galloway was taken by Winkler and a surgical assistant to her floor room. There were no problems during the transfer, and Mrs. Galloway talked to members of her family, telling them she was doing fine. The evidence shows that at this time the patient was alert, and her voice was low, but clear and understandable.
Mrs. Galloway was received in her room by the floor nurse, Nurse Tate, who found the patient to be awake and alert. Mrs. Galloway complained of a scratchy throat and a tickle in her throat. In response thereto, Tate gave the patient a sip of water, which Mrs. Galloway swallowed without difficulty. Tate encouraged Mrs. Galloway to take a deep breath and to cough. Mrs. Galloway had no difficulty with these activities. An examination of her functions revealed that she had good grip strength and could move all extremities. Mrs. Galloway's blood pressure and pulse were normal. Tate observed no swelling in the throat. After assuring herself that the patient was doing well, Tate returned to the nurses' station, leaving Mrs. Galloway in her room with Wanda Collins, Mrs. Galloway's sister.
Mrs. Collins' deposition testimony revealed that while in the room alone with her sister, Mrs. Galloway began having difficulty with breathing. Mrs. Collins testified that Mrs. Galloway's breathing got "much worse, fast." Her condition deteriorated rapidly; she began to struggle, choke, and strangle. Mrs. Collins ran to the nurses' station at about 8:00 p.m. and advised the nurse that the patient was choking. Tate got a suction machine and, with Nurse Belue, went immediately to Mrs. Galloway's room. Tate attempted to suction Mrs. Galloway nasally and sent Nurse Belue to get help from the Neuro Intensive Care Unit.
An emergency call was sounded, and Dr. Berry, a thoracic and cardiovascular surgeon, Dr. Sheely, a thoracic and cardiovascular surgeon, and Dr. Peltier, the emergency room doctor, promptly responded. The physicians encountered difficulty intubating Mrs. Galloway, but eventually, Dr. Berry was able to intubate her. However, by this time, Mrs. Galloway had suffered irreversible injury due to lack of oxygen and died a few days later.
Dr. Kermit L. Walters, a pathologist, performed an autopsy on December 6, 1979. He attributed Mrs. Galloway's death to "anoxia secondary to tracheal compression resulting from arterial bleeding in the right anterior cervical region following C4-C5 diskectomy (sic) and C5-C6 anterior cervical fusion and decompression."
Dr. Ioppolo, the neurosurgeon who was the physician who performed the surgery on Mrs. Galloway, testified as a witness for the plaintiffs, both as a fact witness and as an expert in neurosurgery. He explained the surgical procedures he performed on the patient. In response to questions regarding what type of bleeding was experienced during Mrs. Galloway's surgery, Dr. Ioppolo stated:
If I remember correctly from the operative note, it mentions using the cautery current to control some bleeding sites. It does not mention any particular bleeding site out of the ordinary, just the type of cauterization one uses to control bleeding if one incises the skin, goes through muscles.
Dr. Ioppolo testified that he did not cut or nick any major arteries of the neck. Nor was there any unusual bleeding in the operative site. "Everything was routine," according to his testimony.
Later, on cross, Dr. Ioppolo acknowledged that something apparently occurred after Mrs. Galloway left surgery. Bleeding from the area at or near the surgical site began and then developed to a point where Mrs. Galloway had respiratory problems. Dr. Ioppolo read into the record his "progress notes" of August 21, which stated:
Patient in recovery room ... patient in R.R., doing very well. Moving all extremities, talking and quite awake. Brought to floor in same condition and then at approximately 7:45 p.m. said that she had to cough, did so and had a respiratory arrest. Intubated after some difficulty and delay. Neuro exam. Pupils *1175 dilated and fixed. No response to pain. Apneic without corneals. After several minutes, pupils responsive to light, no corneals. Breathing slightly on own. Impression, hypoxic. Brain damage. Prognosis, grave.
Dr. Ioppolo further testified that the hospital records showed that prior to the development of these problems, Mrs. Galloway's vital signs were "all normal," and that there was a normal blood pressure. Dr. Ioppolo confirmed, however, that the symptoms of the bleeding did not evidence themselves until after Mrs. Galloway had been placed in her room.
Dr. James A. Poche, Jr., a neurosurgeon who served as a member of the review panel, testified as an expert witness for the plaintiffs, and stated that, based on the documents presented to the panel, he was, at that time, of the opinion that the hospital had departed from the standard of care. He stated: "I think at this time what concerned me about that, or why I feel like that was that ... [Mrs. Galloway] had obviously died from bleeding into the operative site in her neck and tracheal compression. And I found it rather difficult to imagine that that could take place over a period of time without this being noticed."
In his testimony on cross, Dr. Poche said that on reflection and after discussion with Dr. Lohmann, another panel member, he was of the opinion there was no substandard care by the hospital. In the discussion with Dr. Lohmann, Dr. Lohmann had pointed out that he was troubled by the panel's review of the case. Dr. Lohmann mentioned a drop of the systolic blood pressure to 90, the administering of a steroid medicine during the surgery, and the hematocrit readings which showed a substantial blood loss. These observations caused Dr. Poche to reconsider whether a blood vessel "might have been injured at the time of surgery, caused some bleeding, then coagulated, or stopped, and at some point postoperatively the clot or thrombus within the artery gave way and the artery again started to bleed."
Dr. Poche reiterated that Mrs. Galloway "had a major hemorrhage." He explained his prior opinion as a panel member, that there was a slow bleed, reasoning that he "did not appreciate some of the things that were later pointed out to me that may offer some substance to the fact that it bled rapidly."
Dr. Robert Hanchey, a neurosurgeon who served as a member of the review panel, testified as an expert witness for the plaintiffs. Based on the documents presented to the panel, Dr. Hanchey was of the opinion that Baton Rouge General Hospital had departed from the standard of care required of a hospital toward Mrs. Galloway. He stated that the panel "had difficulty at that time understanding how such a massive hemorrhage could occur and have no ... [premonitory] signs" or without the presentation of recognizable clinical changes "which could have led to an earlier awareness of it and perhaps a different outcome." He could not say when the bleeding started.
Dr. Hanchey then testified that he had serious questions as to whether the hospital staff or nurses could have recognized the hemorrhage. He continued his testimony: "But I do think that a review of the record, I think, shows that there may not have been a clinical ... [symptom] that they [hospital staff and nurses] could have recognized." Dr. Hanchey then read from his prior court testimony (August 23, 1983): "I think that Dr. Wills' testimony would be very important and if indeed there was no perceptible swelling and no significant difficulty in her eyes at the time the patient was seen in recovery, then that shifts the clinical picture to sometime thereafter."
On cross, the following testimony of Dr. Hanchey was elicited:
Q. Dr. Hanchey, let me ask you the bottom line: sitting here today, do you believe that you can say that any of the nurses or a particular nurse at Baton Rouge General Medical Center fell below the standard of care expected of them in this community?
A. I don't. I don't think they fell below the standard of care.
Dr. George Y. Lohmann, Jr., a neurosurgeon who was a member of the review *1176 panel, in his second deposition stated that on further review he had concluded that the hospital was not negligent in its care of Mrs. Galloway. His further reconsideration led him to believe that the hemorrhage had come on suddenly, within a few minutes, and caused compression of the esophagus and trachea resulting in the respiratory arrest of the patient and finally death.
Dr. Thomas B. Flynn, a neurosurgeon, testified as an expert for the defendants. Dr. Flynn was asked what his opinion, after having reviewed the records, was "as to what the mechanism was of this respiratory arrest." He answered:
My feeling was from review of the autopsy record and the patient record, as well as my understanding of the general nature of the operative procedure itself, that the patient had acquired a retro-tracheal hemotoma of a progressive nature, which resulted in collapse of the membranous trachea and airway obstruction.
He also expressed the opinion that the symptoms of the event that happened to Mrs. Galloway would come on in a matter of minutes. Dr. Flynn opined that, from his review of the records, there was no indication that the staff or nurses fell below the standard of care in this case.
Lynn David Galloway, one of the sons of Mrs. Galloway, was present at the hospital during the surgery on his mother. He told of talking with his mother as she was brought from the recovery room:
I asked her how she was doing, and she said she was doing fine. I was happy to see that she was so alert.... She knew who I was. She mentioned the fact that I had to catch an airplane. She knew that I was going to Kansas City later in the day. She mentioned the factI said, "How are you feeling?" She said, "My collar, this collar thing feels tight. I feel as though there's something in ... [my] throat, I wish I could cough it out."
He testified he had no difficulty hearing his mother; her voice was clear. He said he noticed "no drastic change or I would not have left."
As an intermediate court of review, we are not to set aside the trier of fact's factual findings in the absence of "manifest error" or unless such findings are "clearly wrong." Lirette v. State Farm Ins., 563 So.2d 850, 852 (La.1990); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). And, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
In considering the evidence, the trial judge observed particularly the medical evidence and considered that the three physicians who comprised the Medical Review Board had changed their opinions regarding the failure of Baton Rouge General Hospital to comply with appropriate standards of care. The trier of fact found that "[a]ll of Mrs. Galloway's critical signs (blood pressure, pulse and breathing) were normal" until immediately before the respiratory arrest during which Mrs. Galloway was unable to breathe.
Our review of the evidence convinces us that the trial judge was not manifestly erroneous in his factual findings and his conclusion that the evidence fails to support the plaintiffs' contention that the conduct of the hospital's employees fell below the standard of care owed to Mrs. Galloway in this case.
We affirm the judgment of the trial court at plaintiffs' costs.
AFFIRMED.
CARTER, J., dissents for reasons assigned.
SHORTESS, J., dissents with reasons.
CARTER, Judge, dissenting.
The majority determined that the trial judge properly excluded the deposition and prior trial testimony of Drs. Ioppolo, Poche, and Hanchey. I respectfully dissent from this determination.
LSA-C.C.P. art. 1450 A(3)(b) specifically provides that the party seeking to use prior *1177 testimony must show that "such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used." I believe that exceptional circumstances exist in the instant case so as to make it desirable, and in the interest of justice, to allow the depositions and/or prior trial testimony of the physicians to be used for substantive purposes.
The depositions and/or prior trial testimony of Drs. Ioppolo, Poche, and Hanchey revealed the following. In his deposition on March 31, 1983, Dr. Poche testified that, in his opinion, Mrs. Galloway's bleeding developed slowly over a period of several hours and that diligent postoperative care should have revealed the problems she encountered. In his prior trial testimony, Dr. Poche testified that the bleeding occurred over several hours. He also opined that complications would more likely than not have been noticed in the recovery room if the Baton Rouge General had functioned at the standard of care expected.
In his deposition testimony on May 3, 1983, Dr. Hanchey testified that, in his opinion, the bleeding began in the recovery room and continued over a period of several hours. He found fault on the part of the Baton Rouge General in the way Mrs. Galloway was observed and managed postoperatively. In his 1983 trial testimony, Dr. Hanchey reiterated that he thought that the bleeding occurred over several hours. He also opined that the Baton Rouge General fell below the standard of care in its postoperative care of Mrs. Galloway. However, he determined that Dr. Ioppolo followed the proper standard of care in connection with his treatment of Mrs. Galloway.
In his prior trial testimony, Dr. Ioppolo testified that the bleeding Mrs. Galloway suffered occurred slowly. He then testified that if the bleeding occurred over a substantial period of time, one should have seen blood exude from the wound or noticed an accumulation of blood under the skin. If a patient complained, he would expect the nurses to have evaluated the complaints by examining Mrs. Galloway's neck. Dr. Ioppolo also testified that there was significant swelling before the respiratory arrest.
Dr. Lohmann testified, by deposition on March 24, 1983, that he had reviewed the hospital chart, copies of the hospital records, and numerous depositions and determined that the Baton Rouge General failed to comply with the appropriate standard of care with regard to its postoperative care in the recovery room and in the floor room. Dr. Lohmann explained that there was a lack of attention to Mrs. Galloway's complaints of difficulty speaking, swallowing, and breathing.
During his prior deposition testimony, Dr. Lohmann also testified the bleeding began at the time of surgery and continued until Mrs. Galloway's respiratory arrest several hours later. Dr. Lohmann seriously doubted that all of the bleeding developed in fifteen or twenty minutes and that it developed during the couple of hours she was in the recovery room.
Before the instant trial, according to Drs. Poche and Hanchey, Dr. Lohmann without reviewing any new evidence reexamined his earlier position and changed his mind, apparently determining that the hospital did not fall below the standard of care. Dr. Lohmann discussed his change of heart with Drs. Poche and Hanchey, who after reevaluating their prior positions, testified at the instant trial that the hospital did not fall below the standard of care.
Based on the above, I would find that the trial judge erred in excluding the prior testimony of these witnesses as substantive proof and would then examine all of the evidence, including the proffered testimony to determine whether the hospital was negligent. See Stewart v. Zurich Insurance Company, 342 So.2d 1273, 1274-75 (La.App. 4th Cir.1977).
In a medical malpractice action against a hospital, the plaintiffs must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered *1178 an injury, and that the defendant's actions were a substantial cause in fact of the injury. Further, a hospital is bound to exercise the requisite amount of care that the particular patient's condition may require and to protect the patient from external circumstances peculiarly within the control of the hospital. The facts and circumstances of each particular case determines whether a hospital has breached its duties. Smith v. State Department of Health and Human Resources Administration, 523 So.2d 815, 819 (La.1988). The mere fact that an injury occurs or an accident happens raises no presumption or inference of negligence on the part of the hospital. Berry v. Rapides General Hospital, Inc., 527 So.2d 583, 585 (La.App. 3rd Cir.1988).
After carefully reviewing the entire record, taking into account the testimony at this trial and at all previous proceedings, I believe that the plaintiffs successfully established that Baton Rouge General breached the standard of care owed in that hospital employees failed to properly observe and monitor Mrs. Galloway's condition subsequent to her surgery and failed to discover the bleeding that ultimately caused her death.
For these reasons, I respectfully dissent from the majority opinion.
SHORTESS, Judge, dissenting.
A unanimous panel of this court affirmed a directed verdict in a companion case in favor of Dr. Anthony Ioppolo, the surgeon, based in large part upon his testimony and that of Doctors Robert Hanchey and James Poche. See generally Galloway v. Ioppolo, 464 So.2d 386, 390-91 (La.App. 1 Cir. 1985). Ioppolo testified that he positively did not cut a large artery; that litigation by suture (used to control heavy arterial bleeding) was not required during the surgery; and that a drain was not placed in the surgery site because there was no bleeding upon completion of the operation. Galloway, 464 So.2d at 391. Hanchey, one of the three members of the medical review panel convened to review both the conduct of Ioppolo and Baton Rouge General (which found substandard conduct by Baton Rouge General) testified that it was his opinion that the bleeding occurred over several hours. Id. Poche, also a member of the medical review panel, testified that he believed the bleeding "occurred over a period of hours rather than minutes," noting that the autopsy disclosed "no major source of bleeding ... such as a large vessel being transected." Id. All three testified that post-operative bleeding is a well-known complication of any surgery. Id.
The initial consolidated trial against the surgeon and hospital was severed, because a witness made an improper remark regarding the credibility of another witness to the trial judge; defendant requested the mistrial but plaintiff contended that a severance would severely prejudice his case. Id. at 388. This court affirmed the mistrial and severance, essentially, because plaintiffs were unable to articulate "any specific example of how they were actually prejudiced." Id. at 389.
The single dispositive fact of both the case against the surgeon and the present case against defendant hospital is whether a major, fast-bleeding artery, or a smaller artery or perhaps a vein caused the hemorrhage. Here, the trial court equated the doctors' prior trial testimony to a deposition and, relying upon LSA-C.C.P. art. 1450, excluded it. Without expressing an opinion as to whether "exceptional circumstances" within the meaning of Article 1450 exist here that would compel introduction of their testimony under that standard, I feel that resort to Article 1450 was, itself, prejudicial error.
Civil mistrial is a creature of the jurisprudence and is nowhere mentioned in the Code of Civil Procedure. Spencer v. Children's Hospital, 432 So.2d 823, 825 (La. 1983). It derives from the court's general powers of equity in both the Code of Civil Procedure and the Civil Code. Id. (citing LSA-C.C.P. art. 191; LSA-C.C. art. 21). The difference between the new trial, see LSA-C.C.P. art. 1971-79, and the mistrial is that a mistrial is declared during the proceedings whereas new trial is a post-judgment procedural device. See Spencer, *1179 432 So.2d at 826. See also LSA-C.C.P. art. 1973 (providing the discretionary grounds for new trial, which essentially restate the same equitable principles that are grounds for mistrial). The Code of Civil Procedure provides that, in a nonjury trial, it is unnecessary "to resummon the witnesses or to hear them anew ... if their testimony has once been reduced to writing, but all such testimony and evidence received on the former trial shall be considered as already in evidence." LSA-C.C.P. art. 1978. Witnesses may be re-called, but their prior testimony is to be admitted into evidence. Id. Article 1978 was amended by the very same legislation which enacted the Code of Evidence. See 1988 LA.Acts No. 515 sec. 2.[1] The comment to Article 1978 states that the nonjury trial limitation is meant to "accommodate" Article 804 B(1) of the Code of Evidence which excepts former testimony from hearsay only when the declarant is unavailable. LSA-C.E. art. 804 B(1). Interpreting these provisions in para materia, as we must, can lead only to the conclusion that Article 1978 creates an additional hearsay exception for former testimony in the context of a new trial.[2] Prior trial testimony from a proceeding ending in mistrial is much more easily analogized to former testimony in a proceeding ending in the grant of a new trial than to a deposition.
There are also compelling equitable reasons not to allow the fact-finding process to be subverted by the arbitrary exclusion of evidence adduced between the very same parties to the very same dispute in proceedings discontinued as to the present defendant based entirely on equity. The report of a medical review panel is "its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care as charged in the complaint." LSA-R.S. 40:1299.47 G. That opinion, i.e., the panel report, is admissible as evidence but is not conclusive and the parties have the right to call any member to testify as a witness. LSA-R.S. 40:1299.47 H. The three members of the medical review panel unanimously concluded that the hospital, not the surgeon, was negligent in Mrs. Galloway's death. Dr. Lohmann, who testified by deposition in both the first and second trial[3] and was the third member of the review panel, testified in the first trial that complaints of difficulty in breathing indicates the neck should be visually inspected for swelling and for "shifting of the trachea midline structures." At the time of Galloway's respiratory arrest her trachea had shifted laterally to such an extent that Dr. Berry had serious difficulties intubating her and in fact tore her esophagus during this procedure. Lohmann stated in 1983 that it would be impossible to determine if there is swelling without removing the collar and premised his conclusion of hospital negligence on the fact that "no one bothered to look at the neck wound for the entire period she was in the recovery room." In the 1984 deposition Lohmann has changed his opinion, giving several reasons: (1) his prior decision was based upon the assumption that the "Thomas" collar that was never removed was a hard leather collar which could not be adequately moved aside to examine for swelling; (2) that Wanda Collins, Galloway's sister, examined the neck for swelling; and (3) that the blood pressure drop and increased pulse over the hour following her crisis as 7:55 indicates a sudden acute loss of blood. Additionally, Lohmann identifies the vertebral artery as the source of the bleeding.
In his 1983 deposition, however, Lohmann described the "Thomas" collar as a "fairly firm styrofoam" collar. Wanda Collins *1180 deposition establishes, unequivocally, that she did not check the neck for swelling because the nurse instructed her only to look for blood on the gauze bandage covering the surgical site and to do this while the collar remained on. The pathologist stated he looked for a source of bleeding during the autopsy and would have found a major artery, like the vertebral; in addition he states that bleeding from the vertebral artery would have resulted in a much more dramatic blood pressure drop much sooner than one hour post-arrest.
Poche, whose prior trial testimony was proffered, testified at the present trial that he did not agree with Lohmann that the vertebral artery was a source and suggested a smaller, unnamed artery (such as one of the thyroid arteries) as the source. He testified that he changed his opinion as to hospital negligence because Lohmann discussed with him certain factors which indicate a significant blood loss during surgery, including a significant blood pressure drop and the administering of a steroid during the procedure, suggesting perhaps an artery bled and coagulated during surgery. However, Lohmann never testified to a blood pressure drop during surgery and never mentioned anything about a steroid, but he identified no independent source, such as medical records, for this shift. It is the possibility of significant blood loss during surgery which, Poche explains, has changed his mind. There is uncontroverted evidence in the record, however, that only 150 cc's of blood was loss during surgery. The blood loss during surgery can be measured accurately because it is suctioned. Dr. Wills, the anesthesiologist who monitored Galloway during the surgery, testified that the operation was uneventful, that there was no major blood loss or blood pressure drop, and that only 150 cc's were lost.
Hanchey, whose prior prior testimony has been proffered, testified at the present trial that he "perhaps [has] not changed [his] mind all the way," and also disagrees with Lohmann that the vertebral artery was the source of the bleeding, suggesting, as did Poche, that perhaps a thyroid artery was injured which resulted in several hours of intermittent bleeding. Hanchey, like Poche, testified his opinion is now inconclusive as to hospital negligence because he is not sure that Galloway's symptomstightness in the throat, difficulty breathing, and hoarsenesswere sufficient to alert the recovery room personnel to the bleeding. It appears that Hanchey reaches this revised, ambiguous position based upon statements in Lohmann's deposition that Dr. Wills checked Galloway's neck for swelling and found none, which Hanchey interprets as indicative of a more rapid onset of symptoms. Wills however stated she did not check the neck for swelling, that the recovery room personnel were responsible for checking for swelling, and that she could not even recall whether Galloway was wearing neck collar.[4] Hanchey's 1983 trial testimony indicates that the combination of tightness, hoarseness, and breathing difficulties should have suggested that the nurses consider calling the doctor and that if the complaints were sufficient, the collar should have been removed.
The trial court's reasons for judgment place great emphasis on the three medical review panel expert's change of opinion: "each of the three physicians retracted their prior finding and at trial suggest that there was not any evidence that would have put any of the nurses on notice that Mrs. Galloway was suffering from internal bleeding that would cause respiratory problems." The court, not the expert witnesses, is empowered to make factual findings. The opinion of the medical review panel is admissible, crucial evidenceboth in the form of their report and their trial testimony. LSA-R.S. 40:1299.47 G-H. The panel's findings of fact are as necessary a *1181 component of this evidence as is their expert opinion; however, there is nothing in the Medical Malpractice Act which suggests that the panelists are empowered to re-adjudicate facts when the matter comes to court. The exclusion of their prior trial testimony essentially prevented the court from considering the opinion of the medical review panel. This is not to say that these witnesses are not entitled to change their individual opinions, respectively, and that the court is not entitled to accept this testimony as more credible than the opinion of the panel, but rather that their initial opinion, in its entirety, should also be considered. The trial court did not do this and seems to have entirely deferred to their individual opinions expressed at trial. I have only highlighted some of the more obvious inconsistencies and factual errors between the trial and proffered testimonies. Under these circumstances I respectfully conclude that it was prejudicial error to exclude the former testimony. Under an independent review, there is insufficient evidence to support Lohmann's theory or any theory that proposes that the bleeding occurred over a short period of time. The evidence strongly suggests that the bleeding had begun well over an hour before Galloway's respiratory arrest at 8 p.m. With this factual scenario, the expert testimony indicates that all of Galloway's complaints should have incited further inquiry from the nursing staff. The wound should have been visualized. It was not. The evidence indicates that remedial measures, had the bleeding been discovered, could have been accomplished in a matter of minutes by simply reopening the wound and removing the hematoma.[5]
I respectfully dissent.
NOTES
[1] The plaintiffs are Mrs. Galloway's two surviving children; her husband and one of her sons died in the meantime.
[2] The panel was comprised of Dr. George Y. Lohmann, Jr., Dr. Robert E. Hanchey, and Dr. James A. Poche.
[3] At that time, Dr. Ioppolo was also a defendant in the suit; however, upon declaring a mistrial, the cases were severed, and the matter proceeded to trial against Dr. Ioppolo. Galloway v. Ioppolo, 464 So.2d 386 (La.App. 1st Cir.1985).
[4] Dr. George Lohmann, Jr. did not testify at trial, but his prior deposition testimony was offered into evidence by the plaintiffs without objection.
[5] By Acts 1990, No. 134, § 1, the text of LSA-C.C.P. art. 1450 A(3)(b) was redesignated as LSA-C.C.P. art. 1450 A(3)(c).
[1] Section 12 of Act 515 states that its provisions "shall govern all hearings, trial, or re-trials, and other proceedings to which it is applicable...." 1988 LA Acts No. 515 sec. 12.
[2] This exception, unlike Code of Evidence Article 804(B)(1), includes expert testimony. Compare LSA-C.C.P. art. 1978 with LSA-C.C. Art. 804(B)(1).
[3] Lohmann's second trial deposition, taken in 1984, was entered into evidence by defendant and contains the entirety of his first trial deposition, therefore both his previous and present trial testimony is in evidence.
[4] Plaintiffs' attorney attempted to impeach Hanchey on this inconsistency and asked Hanchey to assume Wills did not remember examining the neck and testified that such was not her responsibility; Hanchey at that point requested to see the deposition. This interchange illustrates the serious problems one encounters when attempting to impeach or even question expert witnessesthese difficulties are further exacerbated when the expert has served on a medical review panel and has, necessarily, adjudicated facts in reaching his conclusion.
[5] Dr. Walters testified this could have been done with the index finger once the wound was open.