602 So.2d 1003 (1992)
GALLOWAY, et al.
v.
BATON ROUGE GENERAL HOSPITAL, et al.
No. 91-C-2278.
Supreme Court of Louisiana.
July 1, 1992.
Leslie J. Schiff, Sandoz, Sandoz & Schiff, Opelousas, for applicant.
Felix R. Weill, Watson, Blanche, Wilson & Posner, Baton Rouge, for respondent.
CALOGERO, Chief Justice.
On August 20, 1979, Mrs. Ora Fay Galloway entered the Baton Rouge General Hospital for neck surgery to be performed by Dr. Anthony S. Ioppolo.[1] When the surgery was completed, at about 5:00 p.m., Mrs. Galloway was taken to the recovery room where she remained until approximately 7:15 p.m. At that time she was transported to her private hospital room. Mrs. Galloway's sister, Wanda Collins, was with her. At about 7:55, in Wanda's presence, Mrs. Galloway stopped breathing.
Wanda immediately ran to the nurses station where she informed the floor nurses that Mrs. Galloway could not breathe. The nurses began emergency procedures and notified the on-duty doctors who were *1004 eventually able to intubate Mrs. Galloway and restore breathing. However, she suffered brain damage and remained in a coma until she died about one week later.
Mrs. Galloway's survivors instituted proceedings against the Baton Rouge General Hospital in accordance with the Louisiana Medical Malpractice Act. A medical review panel was thus convened to evaluate the liability of the Hospital. Plaintiffs sued Dr. Ioppolo without first presenting his possible liability to a medical review panel because Dr. Ioppolo was not a "qualified health provider".[2] The medical review panel, consisting of three neurosurgeons, Dr. Robert E. Hanchey, Dr. James A. Poche and Dr. George Y. Lohmann, reviewed the entire medical procedure and hospital confinement and issued a report concluding that the Hospital had failed to comply with the appropriate standard of care.
The lawsuits against the Hospital and Dr. Ioppolo were consolidated. After trial commenced, however, the judge granted the Hospital's motion for a mistrial[3], then severed the lawsuits. Over the objection of plaintiffs' counsel, trial continued in the suit against Dr. Ioppolo.
Dr. Poche and Dr. Hanchey testified at that first trial, prior to the grant of the mistrial, opining that the Hospital had been negligent. The other panel member, Dr. Lohmann, gave a deposition, introduced at that trial, to the same effect. He stated that the Hospital had deviated from the requisite standard of care. Each of the doctors expressed their belief that Dr. Ioppolo had not been negligent.
The trial in the suit against Dr. Ioppolo ended with a directed verdict in his favor. That was in August of 1983. Another trial, this one against the hospital alone, began on May 1, 1984. On the second day of that trial, the judge declared a mistrial on his own motion. His reason for doing so was that a member of his family had encountered a problem with the Hospital. Only Dr. Poche had testified before the judge declared the mistrial on that occasion.
Soon after this mistrial, Dr. Lohmann contacted counsel for both parties to inform them that he had changed his opinion. He then expressed this change of opinion regarding the Hospital's fault in a deposition taken on May 4, 1984. He was no longer of the view, earlier expressed by all three medical members of the review panel, including himself, that the Hospital had failed to comply with the appropriate standards of care.
Dr. Poche then advised counsel on June 26, 1984, that he had, by then, reexamined the evidence and believed there was another possible explanation for the respiratory arrest which would relieve the Hospital of liability, i.e., that an artery or other vessel had been nicked during surgery, perhaps coagulated, then had become unbound, leading to a rapid onset of bleeding, an event not easily and quickly detectable by the Hospital's attending personnel.
The changed opinions of Dr. Lohmann and Dr. Poche prompted plaintiffs' request for a continuance in the district court. The motion was granted. Because he felt that the changed testimony of the doctors, particularly that of Dr. Poche, undermined the testimony of Dr. Ioppolo, counsel for plaintiffs also filed a Motion to Remand with the court of appeal where the case against Dr. Ioppolo was then pending. This motion was denied by the court of appeal.
In the interim between the second mistrial and the beginning of the third trial[4], the court of appeal affirmed the district court judgment responsive to the directed verdict in favor of Dr. Ioppolo. Galloway v. Ioppolo, 464 So.2d 386 (La.App.1st Cir. *1005 1985). Plaintiff did not seek writs in this Court and the judgment of the court of appeal became final.
The trial involving the Hospital was finally held in September of 1989. At that time the third panel member, Dr. Hanchey, joined Dr. Lohmann and Dr. Poche in expressing a change of opinion. Thus, Doctors Hanchey and Poche by trial testimony, and Dr. Lohmann by deposition, all expressed opinions, contrary to their unanimous panel opinion and prior testimony, that the Hospital had not been at fault.
Counsel for plaintiffs attempted to introduce in plaintiffs' case in chief as direct substantive evidence, the prior trial testimony and earlier deposition testimony of Doctors Poche and Hanchey.[5] The trial judge refused to allow this evidence except for the purpose of impeachment.[6] On the evidence which was admitted, the trial judge found that plaintiffs had not carried their burden of proving the negligence of the Hospital. A five judge panel of the court of appeal affirmed, despite the strong dissents of two judges. 583 So.2d 1169 (La.App.1 Cir.1991).
We granted writs in this case to determine whether the trial judge erred in excluding the prior trial testimony of Doctors Poche and Hanchey as "direct substantive evidence" and whether, if the exclusion was error, plaintiffs, now, with the benefit of that prior trial testimony, should be found to have sufficiently proven their case. Finding the exclusion of the prior trial testimony of Doctors Poche and Hanchey to have been erroneous[7], we have thereupon examined the record, including the proffered evidence, and now conclude that plaintiffs did sustain their burden of proving that the Hospital did not comply with the appropriate standard of care.
That the trial judge erroneously excluded the former trial testimony of Doctors Poche and Hanchey becomes apparent when one considers the overall scheme of the Medical Malpractice Act. The Act was implemented in response to a perceived crisis caused by "prohibitive costs in connection with medical malpractice insurance". Everett v. Goldman, 359 So.2d 1256 (La. 1978). Because the Act "constitutes a special legislative provision in derogation of the general rights available to tort victims" it must be strictly construed. Head v. Erath General Hospital, 458 So.2d 579 (La. App. 3d Cir.1984), writ denied, 462 So.2d 650 (La.1985); Williams v. St. Paul Ins. Co., 419 So.2d 1302 (La.App. 4th Cir.1982), writ denied, 423 So.2d 1182 (La.1982).
Under the Act "qualified health care providers" obtain a number of advantages. They are benefitted by a cap on the amount of damages a plaintiff may recover. A plaintiff's total recovery is limited to $500,000, "exclusive of future medical care and related benefits": a negligent health care provider is liable for a maximum of $100,000; the balance of damages awarded, up to $400,000, is recoverable from the Patient's Compensation Fund ("PCF"). See La.R.S. 40:1299.41. While the $400,000 limit on recovery from the statutorily-created PCF is without "constitutional infirmity", Williams v. Kushner 549 So.2d 294 (La. 1989), this court has yet to rule on the constitutionality of the $100,000 cap on recovery from a health care provider.[8] Furthermore, ad damnum clauses are prohibited.[9] This Court found that prohibition to *1006 be constitutional in Everett v. Goldman, supra.
Another way in which medical professionals have an advantage and the usual rights of tort victims are altered, is the requirement that an aggrieved "patient must provoke a medical review panel and receive an opinion from it before filing suit in a court of law". Everett, 359 So.2d at 1263. Presumably, the medical review panel, which consists of three doctors and one non-voting attorney serves "to reduce the number of medical negligence claims that go through the expensive and time-consuming process of suit preparation and trial". Webb, K. Recent Medical Malpractice Legislation  A First Checkup, 50 Tulane Law Review 655 (1976).
It was presumed that screening through a medical review panel would encourage settlement because the parties would be given a preliminary view of the merits of the case.[10] As a consequence, "if a claim is found by the panel to be without merit it is thought that the claimant will be likely to abandon his claim or agree to a nominal settlement". Everett, 359 So.2d at 1264 (Citations omitted). "Moreover, a plaintiff who gains a favorable opinion from the panel may be able to negotiate a favorable settlement ... a procedure which also avoids much of the time and expense of a trial". Id.
The Act provides that "[a]ny report of the expert opinion reached by the state medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive". La.R.S. 40:1299.47(H). Moreover, either party may call, at his cost, any member of the panel as a witness.
It is this provision that we find particularly instructive in our determination that the evidence from the first trial, favorable to plaintiffs, should have been admitted. In Everett v. Goldman, supra, the constitutionality of barring a claimant's lawsuit until a medical review panel acts was attacked as a violation of state and federal equal protection and due process clauses. We there concluded that the necessity of screening through a medical review panel was not "unreasonable and seems to be a rational effort to accomplish a plausible goal". Everett, 359 So.2d at 1267.[11] Important to the Everett majority's validation of a scheme which interposed this additional procedure was an offsetting benefit to the plaintiff: "[i]n those cases which do go to trial, a plaintiff successful before the panel will benefit from the evidentiary support of the panel's finding and the testimony of the panel members". Id. (Emphasis added.)
This language in Everett may well have been what prompted one of the dissenting judges in the court of appeal to make the following statement with which we are in agreement:
The opinion of the medical review panel is admissible, crucial evidence  both in the form of their report and their trial testimony. (citation omitted). The panel's findings of fact are as necessary a component of this evidence as is their expert opinion; however, there is nothing in the Medical Malpractice Act which suggests that the panelists are empowered to re-adjudicate facts when that matter comes to court. The exclusion of their prior trial testimony essentially prevented the court from considering the opinion of the medical review panel. This is not to say that these witnesses are not entitled to change their individual *1007 opinions, respectively, and that the court is not entitled to accept this testimony as more credible than the opinion of the panel, but rather that their initial opinion, in its entirety, should also be considered. Galloway v. Baton Rouge General Hospital, 583 So.2d 1169, 1180-81 (La.App.1 Cir.1991) (J. Shortess, dissenting) (emphasis in original).
The court of appeal opinions in this case (one majority and two dissents) approached the problem from three perspectives. The majority treated the problem as simply a matter of the use of depositions at trial and concluded that the earlier testimony of Doctors Poche and Hanchey was inadmissible because under La.C.C.Pr. art. 1450(A)(3)[12] the deposition of a witness may be introduced only if the court finds that the witness is unavailable or that "such exceptional circumstances exist as to make it desirable, in the interest of justice... to allow the deposition to be used". One dissenting judge would have allowed the introduction because he believed that exceptional circumstances existed in this case.
The other dissenting judge opined that resort to Article 1450 was itself prejudicial. He would have analogized the former testimony in the mistrial to former testimony in a case where a new trial is granted. Where a new trial from a non-jury trial is granted, La.C.C.P. art. 1978 specifically allows the use of testimony from the first trial in lieu of summoning and presenting the witnesses anew. Although the witnesses may be recalled, the prior testimony is to be admitted into evidence. Indeed, a mistrial is much like the situation where a new trial is granted, the major difference being that "a mistrial is declared during the proceedings whereas new trial is a post-judgment device". Galloway, 583 So.2d at 1178. The civil mistrial, although not explicitly provided for in the Louisiana Code of Civil Procedure, is an equitable device by which the trial judge may end a trial that would result in some gross injustice. The ability of the trial judge to grant a mistrial stems from the inherent authority of the trial judge to control proceedings and from the power to make equitable decisions in the absence of express law. La. C.C.Pr. arts. 191, 1631 and La.C.C. art. 21.
The foregoing argument for admissibility of the prior trial testimony  that a new trial is akin to a mistrial regarding the admission of that earlier testimony  is inviting. Nonetheless, we find no need to anchor our ruling on that legal determination. It suffices for our ruling in the present case to conclude that not only the panel's finding, but the testimony and depositions given thereafter which support the panel finding, are admissible by virtue of the statutory provision, La.R.S. 40:1299.47(H), and the statutory scheme put in place by the Medical Malpractice Act.
For these reasons, we find that it was error for the trial judge to exclude the panelists' prior trial testimony. Under Gonzales v. Xerox, 320 So.2d 163 (La.1975), the district court's judgment is therefore not entitled to the usual deference on appellate *1008 review. The case will accordingly be decided on the record before us.
As the court of appeal majority noted "[t]he mere fact that an injury occurs or an accident happens raises no presumption or inference of negligence on the part of the hospital". Galloway v. Baton Rouge General Hosp., 583 So.2d 1169, 1173 (La.App.1 Cir.1991), citing Berry v. Rapides General Hosp., 527 So.2d 583, 585 (La.App.3 Cir.1988). However, "[i]t is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control". Hunt v. Bogalusa Community Medical Center 303 So.2d 745, 747 (La.1974). Moreover, determining whether the hospital has "breached the duty of care it owes to a particular patient depends upon the circumstances and facts of that case". Id.
While the fact that Mrs. Galloway died may not raise a presumption of the hospital's negligence, her death, resulting from difficulties associated with a common surgical procedure, does require a careful review of the facts and circumstances, since death does not normally occur following such procedure absent some negligence. After an independent review of the record in this case, we find that the conduct of the Hospital staff in monitoring and observing Mrs. Galloway fell below the required standard of care.
Testimony indicated that post-operative bleeding is a known complication of any surgical procedure, particularly neck surgery. Indeed, some medical accidents happen without any negligence whatsoever. But this is not so in the instance of Mrs. Galloway's death. Although Mrs. Galloway may have bled without fault on the part of either the Hospital or the surgeon she cannot have suffocated without fault. The Hospital staff was charged with the responsibility of ensuring that she did not.
The liability of the Hospital turns upon whether Mrs. Galloway bled suddenly and rapidly, such that there may not have been symptoms before the respiratory arrest discoverable by the staff, or whether she bled slowly, or at least intermittently, giving rise to symptoms prior to the arrest which the staff should have discerned. The weight of the evidence supports the latter scenario.
In reaching the conclusion that the Hospital was negligent, we rely heavily on the expert testimony, given at the first trial, of Doctors Poche, Hanchey and Lohmann who served on the medical review panel. Testimony at the first trial was given when the negligence of both the Hospital and the surgeon, Dr. Ioppolo, was at issue. The changed opinions of the medical review panel doctors expressed at the third trial came after the exoneration of Dr. Ioppolo in the district court. We find the testimony from the first trial more reliable and persuasive than the testimony given at the third trial.
Doctors Hanchey and Poche testified at the first trial that in their opinion the Hospital staff had failed to properly monitor Mrs. Galloway. Dr. Hanchey premised his assessment largely upon the pathologist's report which indicated that a substantial amount of bleeding had occurred. Given the report of Dr. Kermit Walters, the pathologist, Dr. Hanchey believed that the nurses notes must not have reflected the clinical signs that were likely present preceding Mrs. Galloway's respiratory arrest.
Dr. Poche, like Dr. Hanchey, opined at that first trial that it was unlikely a patient could experience bleeding of the magnitude Mrs. Galloway suffered without the occurrence of symptoms such as pain, difficult breathing or other signs that should have been noticed and further investigated by the staff. He found significant the fact that Mrs. Galloway complained of discomfort and tightness in her throat as she was transported from the recovery room to her private room. Both Dr. Poche and Dr. Hanchey stated at the first trial it was their belief that the bleeding had occurred over a period of hours rather than minutes. Moreover, at the third trial, while giving his changed opinion that the Hospital was not at fault, Dr. Hanchey's testimony on the symptoms at the time of the bleed did not deviate from what he had said earlier, *1009 i.e., that it was a slow bleed which led to Mrs. Galloway's death.
Dr. Hanchey and Dr. Poche testified at the third trial that they had reconsidered the evidence and believed that the Hospital had not been negligent. Dr. Poche attributed his changed opinion to conversations with Dr. Lohmann where he (Dr. Lohmann) pointed out evidence which suggested a sudden and rapid onset of bleeding.[13] According to Dr. Poche, Dr. Lohmann had told him that Mrs. Galloway's blood pressure decreased significantly during surgery and she was given a steroid during surgery. Thus, concluded Dr. Poche, something must have bled abnormally during surgery: he opined that a vessel smaller than the vertebral or carotid artery such as a thyroid artery was injured during surgery and caused bleeding, the vessel coagulated or stopped bleeding, and some time post-operatively the clot gave way causing the vessel to again bleed. We find this testimony unpersuasive for several reasons.
Dr. Lohmann does not mention in his final deposition (nor at any other time) the scenario upon which Dr. Poche premised his changed opinion. Rather, in his own "changed mind" deposition, Dr. Lohmann noted that the hospital records indicate that after the respiratory arrest, rather than during surgery, Mrs. Galloway's blood pressure decreased drastically and she was given the drug Dopamine to stabilize her blood pressure.[14]
Also, the testimony of the surgeon, Dr. Ioppolo, undermines Dr. Poche's theory. Dr. Ioppolo testified that he did not injure a major artery during surgery. Dr. Ioppolo's assertion is corroborated by the testimony of Dr. Lillian Wills, the anesthesiologist who testified that during surgery all of Mrs. Galloway's vital signs were normal. Moreover, the medical records do not reflect any abnormal blood loss during surgery.
Dr. Lohmann, in his deposition introduced at the first trial, focused upon the fact that none of the nurses had removed the surgical collar which Mrs. Galloway was wearing to check for swelling and to visualize the surgical site. He stated it was absolutely necessary to remove the collar to check for swelling, bleeding, or shifting of the midline structures, i.e., the trachea and esophagus. Emphasizing that the collar must be removed regardless of the type collar, hard or soft, that the patient is wearing, Dr. Lohmann stated that no collar, unremoved, permits adequate examination of the neck.
At the third trial, Dr. Lohmann premised his reassessment of the evidence on his purported misimpression about the type of collar that Mrs. Galloway had been wearing. In the deposition introduced at the first trial, however, he unequivocally stated that there is no collar which allows adequate examination without removal. In his subsequent deposition, Dr. Lohmann explained this discrepancy merely by stating that he had changed his mind and now believed that one could adequately examine the neck area without removing the collar.
At the first trial, Dr. Lohmann, like Doctors Poche and Hanchey, suggested in his deposition, that considering the massive amount of blood Mrs. Galloway lost, there must have been symptoms which the staff could have investigated earlier. Specifically, he asserted the probability that there were noticeable symptoms in the recovery room where Mrs. Galloway was kept for two hours and fifteen minutes under the nursing staff's care and observation.
*1010 Other testimony corroborates the doctors' conclusion that there were symptoms the staff should have investigated earlier. Mrs. Galloway's sister, Mrs. Wanda Collins testified that Mrs. Galloway complained of discomfort and tightness in her throat and requested to have the collar loosened as she was transported from recovery to her private room. Mrs. Collins also noted that Mrs. Galloway's voice was raspy and hoarse and that on several occasions she (Mrs. Collins) asked the nurses if these symptoms were normal.
An additional reason we give little weight to the changed opinion of Doctors Poche, Hanchey and Lohmann that the Hospital was not at fault is because these doctors conceded that as a panel, they had considered the possibility that the bleeding occurred suddenly and rapidly, and as a panel, they concluded, and as witnesses at the first trial reiterated, that the possibility of a rapid bleed and correspondingly, the possibility of there not being any telling symptoms, was slight. And, quite importantly, the doctors did not offer any meaningful reasons for changing their original expert opinion that the Hospital had failed to properly monitor Mrs. Galloway.
On the evidence presented in the trial of this case, including the proffered first trial testimony of Doctors Poche and Hanchey, plaintiffs have established by a preponderance of the evidence that the conduct of the Hospital staff in caring for Mrs. Galloway fell below the required standard of care.
Because the court of appeal found that the Hospital was not at fault, they did not have occasion to review the matter of quantum. As is our custom in cases such as this, we remand to the court of appeal for a determination of the amount of damages to be awarded plaintiffs. See McMillan v. State Farm Mut. Auto. Ins. Co., 356 So.2d 1368 (La.1978); Boudreaux v. American Ins. Co., 264 So.2d 621 (La.1972).
For the foregoing reasons the judgments of the district court and court of appeal dismissing plaintiffs' lawsuit with prejudice are reversed and set aside. There will be judgment herein in favor of plaintiffs and against defendant, Baton Rouge General Hospital on liability. The case is remanded to the court of appeal to render an appropriate judgment, including the amount of damages to which plaintiffs are entitled.

DECREE
REVERSED; REMANDED TO THE COURT OF APPEAL.
NOTES
[1] Specifically, Mrs. Galloway underwent a discectomy, an anterior cervical fusion and decompression.
[2] This term is a technical designation for a health care provider who opts for coverage under the Medical Malpractice Act, secures the appropriate insurance coverage and pays a surcharge into the Patient's Compensation Fund.
[3] The trial judge gave as his reason that someone had commented on the credibility of one of the witnesses in his presence.
[4] The term "third trial" is used in reference to the trial against the Hospital which resulted in the judgment here under review. Two earlier trials had commenced against the Hospital, both of which ended in a mistrial.
[5] Counsel also attempted to introduce for that purpose Dr. Ioppolo's testimony from the first trial when he was a defendant. As in the case of Doctors Poche and Hanchey, the district court refused to admit the former testimony, while allowing its use for impeaching Dr. Ioppolo's testimony at this trial.
[6] Counsel was allowed to proffer the evidence.
[7] The district court's exclusion of the prior trial testimony and deposition of Dr. Ioppolo, the surgeon, was not erroneous. He was a defendant in the first trial who testified in the trial against the Hospital and not, like Doctors Poche and Hanchey, a Medical Review Panel member.
[8] This Court has recently granted writs to address this issue. Oral argument will be held later this year in Cleo Butler v. Jerome Medley, M.D. & Flint Goodridge Hosp., 92-CC-0559 on the docket of this Court.
[9] An ad damnum clause is one by which a plaintiff prays for a particular amount of damages. This provision of the Medical Malpractice Act, La.R.S. 40:1299.41 E.(2), forbids such clauses in a plaintiff's pleadings.
[10] See discussion in Everett v. Goldman, 359 So.2d 1256 (La.1978).
[11] Explaining the practical impact of the panel review requirement, we further stated:

A panel determination adverse to a malpractice claimant's interest does not preclude his filing a lawsuit. Such a determination would seem to exert subtle pressure on the claimant in a case of little worth to abandon or to settle his claim reasonably, thereby saving the defendant and his insurer the time, expense and worry of apparently needless litigation. And a favorable panel decision will probably aid the claimant in exerting pressure on a defendant to settle the case reasonably, thus treating the malpractice victim to savings in time and expense and to avoidance of possible risky litigation.
[12] La.C.C.P. art. 1450 provided:

A. At the trial ... any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence, applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness.
* * * * * *
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
(a) That the witness is unavailable, or
(b) Upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.
[13] Just after the trial judge declared a mistrial in the second trial against the Hospital, Dr. Lohmann contacted counsel for both plaintiffs and defendant to inform them of his changed opinion. Because he was moving his practice to New York, Dr. Lohmann gave a deposition expressing his new opinion. In June of 1984, Dr. Poche, presumably after conversations with Dr. Lohmann, informed counsel for both sides that he had reconsidered the evidence and had also changed his opinion.
[14] These facts, suggested by Dr. Lohmann, unlike the scenario posed by Dr. Poche, are supported by the medical records. Specifically, the nurses notes show that after the arrest, Mrs. Galloway's blood pressure dropped, her pulse increased and she was given Dopamine.