830 So.2d 1072 (2002)
Sheri L. DELANEY
v.
HUMANA HOSPITAL, Puckett Laboratory and William J. Farrell, M.D.
In re In the Matter of Sheri Delaney
v.
Humana Hospital, Puckett Laboratory and William J. Farrell, M.D.
Sheri Delaney
v.
Galen-Med, Inc., William J. Farrell, M.D., Pathology Laboratories, Ltd. (Mississippi), and Louisiana Medical Mutual Insurance Company.
Nos. 2001-CA-0389, 2002-CA-1089, 2002-CA-1090.
Court of Appeal of Louisiana, Fourth Circuit.
October 16, 2002.
*1075 L. Stephen Rastanis, Law Office of L. Stephen Rastanis, Baton Rouge, LA, for Plaintiff/Appellant.
Franklin D. Beahm, Joseph E. Windmeyer, Jr., Beahm & Green, New Orleans, LA, for Defendant/Appellee, Humana Hospital.
Stephen M. Pizzo, Dante' V. Maraldo, Mary K. Peyton, Blue Williams, L.L.P., Metairie, LA, for Defendant/Appellee, Dr. William J. Farrell.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge DENNIS R. BAGNERIS, SR., Judge DAVID S. GORBATY).
Chief Judge WILLIAM H. BYRNES III.
Plaintiff-appellant appeals a judgment of the district court dismissing her mental anguish personal injury/medical malpractice claim against defendants-appellees, Humana Hospital[1], and Dr. William Farrell[2], arising out of a false positive HIV test. We affirm.
In 1992, the plaintiff-appellant, Sheri Delaney, received Ob-Gyn services in connection with her first pregnancy from Dr. William Farrell, a defendant-appellee. Plaintiff alleges that Dr. Farrell had an HIV test performed on her without her consent sometime around April 23, 1992, early in the course of treatment. The results of this test were negative.
Plaintiff alleges that on or around May 26, 1992, she was told that she was taking a routine blood glucose test, but unbeknownst to her and without her consent, Dr. Farrell ordered a second HIV test which resulted in a false positive which was reported to the plaintiff by Dr. Farrell. The blood for this test was drawn at Humana, but Humana did not actually *1075 conduct the test itself. Instead it sent the sample to Puckett Laboratories where the test was actually performed.
On June 9,1992, Dr. Farrell's office telephoned the plaintiff and asked her to come in for an appointment on June 12, 1992, to discuss her test results. Assuming that this meant that there was a problem with the test results, plaintiff had the appointment pushed up to June 10. When plaintiff and her mother who was with her were given the news by Dr. Farrell, plaintiff became hysterical.
Plaintiff alleges that Dr. Farrell told her that he could no longer treat her and that she should instead go to Charity. Plaintiff also alleges that Dr. Farrell gave her no referral, but merely told her to look the number up in the phone book. Plaintiff further alleges that Dr. Farrell failed to inform her that there was a high risk clinic at Charity Hospital. Plaintiff describes these actions by Dr. Farrell as an abandonment.
After allegedly being turned down by several private Ob-Gyn specialists because of her positive HIV test results, plaintiff's mother called the main switchboard at Charity. She was able to make a June 12, 1992 appointment with Dr. Mohammed Bey. On June 16, 1992, Charity conducted another HIV test which came back negative. Thereafter, the plaintiff was able to receive care from a private physician for the duration of her pregnancy.
Concerning plaintiff's allegations that she never gave informed consent for the two HIV tests, Dr. Farrell's testimony contradicts the allegations made by the plaintiff. Dr. Farrell testified that he specifically recalled explaining the blood tests to the plaintiff consistent with his routine practice. Dr. Farrell explained that once he advised plaintiff of the tests that plaintiff had the opportunity to ask questions and to refuse the tests if she so wished. He testified that none of his patients, including the plaintiff had ever declined the tests.
Plaintiff testified that Dr. Farrell did not tell her about the HIV test on her first visit, although at the time she was deposed she could not recall if she had been told about the HIV test. She explained that her nervousness at the time of her deposition caused her to forget certain facts that she was later able to remember at the time she testified at trial. A reasonable fact finder could choose not to be persuaded by her "improved" memory at trial. Moreover, she testified that she would have consented to the first HIV test out of concern for her baby:
Q. When you began treatment at Doctor Farrel[l]'s office were you ever told by Doctor Farrell or Doctor St. Romain or any of his staff that you would be given a test for HIV 2 times?
A. No.
Q. Sheri, would you have consented to the first HIV test?
A. Yes.
Q. Would you consented [sic] to the second HIV test?
A. No.
Q. Sheri, during your deposition you were asked a question if Doctor Farrell would have told you it was in the best interest of your child, you would have consented, is that still the way you feel today?
A. No, today I know a lot more from what I've learned a lot, I know that I have options, which I didn't know I had then.
As the plaintiff may not recover in an action based on lack of informed consent where it is shown that she would have consented to the operation or treatment *1076 even if she had known of the risks, her own testimony defeats any claim she might have had based on the first HIV test. In re Medical Review Panel of Morris, 99-0657 (La.App. 4 Cir. 12/05/01), 802 So.2d 999, 1003. Therefore, the only informed consent issue that need concern this Court relates to the second HIV test.
Dr. Farrell denied ordering the second test. A reasonable fact finder could choose to believe this testimony. Dr. Farrell contends that Dr. St. Romain ordered the second test. In fact, plaintiff's original brief concedes this point:
It just so happened that Ms. Delaney saw Dr. St. Romain that day because Dr. Farrell was out of the office that day. But, Dr. St. Romain ordered the second HIV test because he was merely following Dr. Farrell's standard operating procedure. Dr. Farrell wanted the second HIV test because that was his policy. Dr. Farrell is at fault since Ms. Delaney was his patient and Dr. St. Romain would not have ordered a test for another doctor's patient unless that doctor wanted the test run.
Plaintiff apparently altered her position in her brief in reply to Dr. Farrell's brief because in her reply brief the plaintiff takes the position that:
It is undisputed that Dr. Farrell ordered two HIV tests for all of his patients including Ms. Delaney. [Emphasis added.]
Plaintiff's reply brief fails to address this inconsistency. Even without giving the trial court the deference owed under the manifest error standard of review, the record compels the conclusion that the plaintiff gave her consent to the second HIV test and even if she did not, Dr. Farrell is not responsible for Dr. St. Romain's failure to obtain consent to the second test. The plaintiff admitted on direct examination that it was Dr. St. Romain she saw in connection with the ordering of the second test, not Dr. Farrell:
Q. Now you remember today you went in and was told that you were going to have the diabetes test?
Q. Who was there that day?
A. My mom and Doctor St. Romain.
Thus, plaintiff's own testimony at trial shows that Dr. Farrell was not present when the second blood sample was taken.
The fact that Dr. Farrell would have wanted the test run, does not mean that he ordered the test; it does not mean that Dr. Farrell is responsible for Dr. St. Romain's failure to obtain consent when he ordered the test; and it does not mean that Dr. Farrell did not at some previous time during the course of treatment obtain plaintiff's consent in advance by explaining to her his general policy of obtaining two tests. The plaintiff has effectively conceded this issue. Regardless, there is nothing in the record which would support a finding by this Court that the trial court committed manifest error in failing to find for the plaintiff on this issue.
The lab slip which she brought with her to the hospital to have the second blood test done showed that another HIV test was to be conducted, but she claimed to be unaware of what was on the lab slip. A reasonable fact finder could choose to disbelieve this testimony.
Plaintiff's testimony at trial denying that she would have consented to the second HIV test had she known about it was contradicted by her deposition testimony. She explained this discrepancy by stating at trial that she was disoriented during the deposition. Based upon this discrepancy, along with the testimony and evidence contradicting plaintiff's testimony, a reasonable fact finder could choose not to credit plaintiff's testimony.
*1077 Plaintiff also argues that regardless of what Dr. Farrell may or may not have told her, he did not do it in writing; and even if he obtained her verbal informed consent, that consent was not "contemporaneously documented in writing in the medical record," as required by La. R.S. 40:1300.13A which provides that:
Except as provided, specifically authorized, or required by a state or federal law, no person shall order the performance of an HIV-related test in a hospital without first receiving the written informed consent or verbal informed consent contemporaneously documented in writing in the medical record ...
The record supports the plaintiff's contention that the literal mandates of La. R.S. 40:1300.13A quoted above were not complied with. Dr. Farrell argues that regardless of the statute, verbal informed consent without more was sufficient to meet the standard of care of the medical profession at the time. We agree that the standard of care of the profession is normally the standard by which such matters are judged. However, the standard of care of the profession cannot supercede a duty imposed by a specific statute:
Custom results from practice repeated for a long time and generally accepted as having the force of law. Custom may not abrogate legislation. [Emphasis added.]
La. C.C. art. 3.
"Standard of care" of the medical profession is just another way of referring to the custom and practice of the medical profession. Pursuant to La. C.C. art. 3 quoted above, such custom and practice may not abrogate La. R.S. 40:1300.13A.
However, where the plaintiff admits that she would have agreed to the first HIV test regardless, she may not avail herself of any claim that she might otherwise have had arising out of the failure of Dr. Farrell to adhere to the literal requirements of La. R.S. 40:1300.13A regarding that first HIV test. In re Medical Review Panel of Morris, 99-0657 (La.App. 4 Cir. 12/05/01), 802 So.2d 999, 1003, writ denied XXXX-XXXX (La.4/19/02), 813 So.2d 1093. And as this Court has already determined that Dr. Farrell has no responsibility concerning consent to the second HIV test, any failure to meet the standards of La. R.S. 40:1300.13A regarding the second test cannot be laid at his doorstep.
Moreover, plaintiff-appellant, when questioned by her attorney at trial, effectively acknowledged that she had admitted in her deposition testimony that she would have consented to the second test:
Q. Sheri, during your deposition you were asked a question if Doctor Farrell would have told you it was in the best interest of your child, you said you would have trusted him and you would have consented, is that still the way you feel today.
A. No, today I know a lot more from what I've learned a lot, I know that I have options, which I didn't know I had then.
What this exchange means in the context of plaintiff's testimony as a whole is that at the time of the second test she would have given her consent if asked, but that today based on what she has learned since then she would not have consented to the second test. The standard by which her consent must be judged is what she would have consented to at the time of the second test, not what she would agree to today. This is reinforced by plaintiff's testimony on cross-examination that her view of the issue of consent to the second test is based on change of opinion occurring subsequent to the second test.
*1078 As we infer that she would have consented to the second test at the time that it was administered she cannot, under In re Medical Review Panel of Morris, supra, bring a claim for lack of consent. Plaintiff's tortured explanation at trial of what she would have consented to and under what conditions is not convincing. The trial court made no explicit specific findings on this issue regarding plaintiffs willingness to consent to the second test. However, we find such findings implicit in the judgment of the trial court and as such are to be afforded proper deference by this court under the manifest error standard of review. Regardless, we find that the inconsistencies in plaintiff's testimony between what she said at her deposition and what she said at trial are such that even reviewing the record de novo this court would conclude that plaintiff would have consented to the second test. This finding is reinforced by the fact that after the incidents that form the basis for this litigation, plaintiff admits giving blood which she knew would be tested for HIV and the record reflects that she later had another HIV test in connection with her second pregnancy. She admitted that she knew that she would receive a letter in connection with giving blood if she tested positive for HIV. She also testified that each time she has received negative test results subsequent to the second test, the tests, "Made me feel a lot better ..." The aversion to HIV testing that plaintiff tried to portray in her testimony at trial is just not supported by objective facts. Regardless of whether the record as a whole is reviewed de novo or according to the manifest error standard, we must conclude that the plaintiff would have consented to the second HIV test.
The consent requirements for Humana are different. Humana contends that the law on obtaining informed consent is to be found in La. R.S. 40:1299.40, which contains provision related to informed consent generally. However, Humana's contention fails to take into account La. R.S. 40:1300.13 which deals specifically with consent to HIV testing. Humana and the plaintiff both cite Department of Health & Hospitals Rule 135.13503B(2) which provides that:
If an HIV-related test is to be performed on a person who is an outpatient, or tested at a licensed hospital laboratory by the delivery of blood sample for testing, the person ordering such tests shall first obtain the consent of the patient and specifically so state on the order or request form furnished to the hospital or hospital laboratory, and likewise indicate the patient's choice as to the anonymity (see (Subsection D) below); such statement and/or certification by the person ordering the test may be relied upon by the hospital or hospital laboratory without the necessity for a copy of such consent and/or election by the patient being furnished.
As the plaintiff has effectively conceded that she would have consented to the first test, she has no claim under Department of Health & Hospitals rule 135.13503B(2) for the first HIV test. The issue is the second HIV test and whether Humana has any duty regarding consent separate from that of plaintiff's personal physician who ordered the test. We can infer no primary duty on the part of the hospital to obtain the consent. However, one could arguably infer a duty on the part of the hospital to ascertain that the patient's treating physician has properly discharged his duty to obtain such consent. That is a logical explanation for the language in the rule stating that the hospital could rely on a "statement and/or certification by the person ordering the test ... without the necessity for a copy of such *1079 consent and/or election by the patient being furnished."
Although the plaintiff argues strenuously that she did not and would not have consented to the second test, as discussed above, this Court has already found that she would have consented to the second test. As already noted in this opinion, there is no claim for lack of consent where it can be shown that informed consent would have been given. In re Medical Review Panel of Morris, supra. We find that this principle also defeats plaintiff's lack of consent claim against Humana.
As to plaintiff's claim that Dr. Farrell abandoned her by practically expelling her from his office without a referral to a doctor at Charity or any information about the high risk clinic there after the results of the second HIV test came in, a reasonable fact finder could conclude otherwise based on inconsistencies vis a vis her deposition testimony; the allegation contained in her "Petition for Damages and Medical Review Panel Submission" that Dr. Farrell gave her the phone number for Charity; the testimony of Dr. Farrell; and the testimony of Dr. Miller that it would have been impossible for plaintiff to be seen so soon at the High-Risk Clinic (June 12) after leaving Dr. Farrell (June 10) without a referral from a doctor. All of the experts testified that the LSU High-Risk Clinic was the best place for treatment of a patient with HIV and that it was highly appropriate for Dr. Farrell to refer Ms. Delaney to the clinic. There plaintiff could avail herself of specialists and treatment superior to anything Dr. Farrell could offer, including the only AZT program available in the area at that time. Therefore, we find no manifest error in the finding of the trial court that Dr. Farrell referred plaintiff to the clinic. He did not abandon her.
The plaintiff contends that "the trial court erred in allowing the Medical Review Panel's decision to become part of the record."[3] The plaintiff raised her objection to the Medical Review Panel's opinion in a motion in limine which was denied. The plaintiff acknowledges that the Medical review panel found that "the evidence does not support the conclusion that the defendants, Humana Hospital and Dr. William Farrell, failed to meet the applicable standard of care as charged in the complaint." Plaintiff contends that the opinion should have been excluded from the record because the panel made improper factual determinations beyond the scope of their legal authority as medical experts.
Specifically, the plaintiff complains of the finding made by the panel that Dr. Farrell properly treated the plaintiff by referring her to the LSU Perinatology High Risk Service because plaintiff contends that whether Dr. Farrell actually made the referral is a contested fact. The plaintiff takes the position that the panel exceeded its authority when it chose to credit Dr. Farrell's assertion that he routinely referred high risk patients to the perinatology clinic at LSU in preference to *1080 the plaintiff's assertion that Dr. Farrell asked her to leave his office in a peremptory manner with nothing more than a directive to use the phone directory to get in touch with Charity Hospital. Plaintiff cites Engolia v. Allain, 625 So.2d 723 (La. App. 1 Cir.1993):
Louisiana Revised Statute 40:1299.47(G) provides a medical review panel shall have the sole duty to express its expert opinion as to whether the evidence supports the conclusion that the defendant acted or failed to act within the appropriate standards of care. However, where the evaluation of whether a defendant acted within the appropriate standards of care depends on material issues of fact, not requiring expert opinion, a medical review panel is to leave the factual evaluation for consideration by the court.
Id., at p. 728.
However, plaintiff fails to note that in Engolia the appellate court affirmed the jury verdict in favor of the defendant doctor. La. R.S. 40:1299.47(H) provides that the opinion of the medical review panel "shall be admissible as evidence." Moreover, the statute provides that any member of the medical review panel shall have absolute immunity from civil liability, not only for opinions, but also for findings made in the course and scope of panel duties. Significantly, the fact finder is not bound by the findings of the medical review panel. Based on our review of the record, we find that even without taking the opinion of the medical review panel into consideration, the preponderance of the evidence supports the conclusion that Dr. Farrell made a proper referral. For example: The defendants have demonstrated a number of inconsistencies in plaintiff's testimony described earlier in this opinion that undermine its persuasiveness; the plaintiff can show no comparable inconsistencies in Dr. Farrell's testimony; plaintiff admitted that her petition stated that Dr. Farrell gave her the phone number for Charity; Dr. Miller's testimony that plaintiff would never have been seen so quickly by the high risk clinic had she not had a referral from a doctor; and the fact that the record shows that the LSU High Risk Clinic offered specialists and treatments for HIV that Dr. Farrell could not offer.
Furthermore, in Galloway v. Baton Rouge General Hospital, 602 So.2d 1003, 1006 (La.1992), the Supreme Court specifically expressed its agreement with the statement that:
The opinion of the medical review panel is admissible, crucial evidenceboth in the form of their report and their trial testimony. (citation omitted). The panel's findings of fact are as necessary a component of this evidence as is their expert opinion;.... [T]heir initial opinion, in its entirety, should ... be considered.
The plaintiff also complains that the conclusion of the medical review panel that a false positive had occurred in the testing of the plaintiff's blood which would have occurred at Puckett laboratories where Humana sent the blood for testing, not at Humana. The following finding quoted by the plaintiff in her brief differs significantly from the way the plaintiff describes it:
There is no documentation before the Panel of a miscollection or mislabeling of the patient's blood sample. The fact that Ms. Delaney's result was an apparent false-positive does not, in and of itself, imply a miscollection or other error on the part of Humana Hospital. False-positive of the Western Blot Test is rare but it does happen.
What this finding really says is that miscollection or mislabeling cannot be presumed *1081 in the absence of evidence because false positives can occur even in the absence of human error, i.e., the panel was, in effect, saying that the plaintiff could not rely on res ipsa loquitur to prove her case. This was not a finding that a false positive had in fact occurred. It was merely a finding that the plaintiff had not succeeded in ruling out the reasonable possibility of a false positive. We find that such a conclusion was within the competence of the medical review panel and, for the reasons discussed previously, was properly admissible in the trial court.
For res ipsa loquitur the injury, in this case the false positive, must be one that does not ordinarily occur in the absence of negligence. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1990). False positives do occur in the absence of negligence.
Moreover, res ipsa loquitur does not apply for the additional reason that if either mislabeling or mishandling occurred res ipsa loquitur could not resolve the issue of where the mislabeling or mishandling occurredat Humana or at the Puckett laboratories.
The plaintiff assigned as error the failure of the trial court to find that the negligent handling of plaintiff's blood sample by Humana Hospital resulted in the false reporting of an HIV positive test result to the plaintiff. Plaintiff contends that Humana's negligence occurred when its lab personnel mislabeled the blood sample they collected from the plaintiff.
Plaintiff was sent to Humana's hospital lab where phlebotomist Jean Alexander drew her blood on May 26, 1992. Ms. Alexander testified that she placed a label with plaintiff's name onto the tube of plaintiff's whole blood and then sent it to the chemistry department of the lab to be spun down and separated. Ralph Woods, the only laboratory technician on duty that evening processed the sample. Mr. Woods died before the trial took place, but there is evidence in the record that he was an excellent employee who had not made a mislabeling or other mistake during his seven years of employment with Humana. He spun the vial down by itself. Afterwards, he poured the serum into a separate container. He immediately labeled the vial with an identifying number and forward to Puckett Labs in Hattiesburg for testing. No tests were performed by Humana. It is uncontested that Puckett Labs is unrelated to Humana.
Although the details of how Puckett handled the sample are not known, it is known that first Puckett performed an ELISA screening test which came back reactive/positive. Because of the high incidence of false positives on this type of test, Puckett then performed a Western Blot confirmation test, presumably on the same sample. The two readers of the sample could not determine whether the results were positive or negative. Therefore, they brought in a third reader who was also unsure. Puckett then performed a second Western Blot test. In spite of the fact that the result were again equivocal, Puckett called the results of this test reactive. Contrary to its own policy, Puckett simply informed Humana that plaintiff was HIV positive without mentioning the problematic nature of some of the tests results and without asking for another sample upon which confirmatory tests could be performed.
Humana in turn informed plaintiff's physician, Dr. Farrell, of the positive test results who in turn informed the plaintiff, resulting in this litigation.
Plaintiff's expert, Dr. Patricia Williams testified that it was more probable than not that after plaintiff's blood had been drawn it would have been spun down, *1082 the clear serum separated out, poured into a plastic container and then shipped to Puckett where it was logged in as serum. If Humana had sent Puckett a whole blood sample, Puckett could be expected to log it in as a clot or a whole blood tube. Dr. Williams also suggested the possibility that, "another name was put on the clot... and another tube with serum was sent."
When the specimen was sent to Puckett by Humana, it was logged out by Mr. Woods on the general "send-out log" instead of the "HIV send-out log" as it should have been. Plaintiff suggests that as a result of Mr. Woods' poor health and eighty hour work-week, he likely batched the plaintiff's blood sample along with those of two other of Dr. Farrell's patients who were also being tested for HIV at the same time. Plaintiff notes that there were no written policies against batching at the time plaintiff's blood was tested at Humana, but both Sylvia Hughes and Steve Garcia testified that all lab technicians are instructed not to batch HIV specimens, but to process them one at a time. Plaintiff's expert concluded that a labeling or collection error more likely occurred at Humana than at Puckett based on what she felt were Puckett's superior record keeping procedures and practice standards. She never visited the Puckett lab:
Q. So you don't know for a fact what was done at the laboratory do you?
A. I did not witness the procedure.
Q. And you have not read a deposition or document that told you specifically what was done, you have the results and conclusions but you don't have the actual facts do you?
A. No, I did not witness the procedure.
Her opinion, however, was not based on anything specifically related to the instant case. Moreover, at all times relevant to this litigation the Humana lab maintained its College of American Pathologists (CAP) accreditation, which Dr. Kenneth Farris explained meant that:
If it's CAP accredited for medical testing, that means it has performed at a very high level of proficiency.... It's a very wonderful accreditation process.
Based on a review of the record as a whole we cannot say that the trial court was manifestly erroneous in finding that:
[P]laintiff was unable to show an irregularity or mislabeling of the blood sample by [Humana]. In fact testimony of the experts indicated that false positives did sometimes occur and that one of the risk factors for false positive results was pregnancy.
For the same reasons we can find no manifest error in the trial court's finding that:
If, however, mislabeling or mishandling did occur, the court was unable to determine whether it took place at Humana Hospital or Puckett Laboratory.
Because mislabeling or mishandling, if it occurred, could have occurred either at Humana or Puckett, the doctrine of res ipsa loquitur may not be invoked by the plaintiff to fix the blame on Humana.
The fact that there is evidence in the record from which contrary inferences might be drawn does not mean that the trial court was manifestly erroneous where the record as would also permit a reasonable fact finder to reach the conclusions reached by the trial court.
Plaintiff argues that it was error for the trial court to grant the defendant's motion for partial summary judgment on the issue of punitive damages. As we have found no liability on the part of either defendant on appeal, we do not reach this issue.
*1083 For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Defendant, Humana, has apparently gone through a number of corporate transformations and/or name changes. In its latest pleading it styles itself as: Lakeland Medical Center, L.L.C. d/b/a Lakeland Medical Center f/k/a Galen-Med, Inc. f/d/b/a Lakeland Medical Center f/k/a Humedicenters, Inc., f/d/b/a Humana-Hospital-New Orleans. For the sake of brevity, this opinion generally refers to this defendant simply as, "Humana." There is no dispute among the parties as to the identity of this defendant and Humana as interposed no defenses on the basis of its proper legal identity.
[2] A third defendant, Puckett Laboratory, was dismissed from the case pursuant to a confidential settlement agreement.
[3] Dr. Farrell complains that the failure of the plaintiff to include the judgment of the medical review panel in the record should preclude the plaintiff's assault on that judgment. Gay v. C & D of Shreveport, 25,319 (La.App. 2 Cir. 10/26/94), 645 So.2d 280; Hurt v. Western American Trucking Company, 26,918 (La.App. 2 Cir. 5/10/95), 655 So.2d 558; West Consolidated Co., Inc. v. Creole Fisheries, 616 So.2d 268 (La.App. 2 Cir.1993); Werner Enterprises v. Westend Dev. Co., 563 So.2d 540 (La.App. 5 Cir.1990); Versailles Arms Apartments v. Granderson, 377 So.2d 1359 (La.App. 4 Cir. 1979). However, as we have determined that the plaintiff's arguments are without merit even if we accept the plaintiff's quotations from that judgment at face value, we have decided to dispose of the matter on the merits rather than duck the issue on procedural grounds.