# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-81

MAZELLA SHAHAN FLOURNOY

VERSUS

OUR LADY OF LOURDES REGIONAL MEDICAL CENTER, INC. AND KEITH COLOMB, M.D.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20094550
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE

**********

## DAVID E. CHATELAIN*
## JUDGE

**********

Court composed of Shannon J. Gremillion, John E. Conery, and David E. Chatelain, Judges.

**Conery, J., dissents and assigns reasons.**

**AFFIRMED**

_____

*Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Jason M. Welborn**
**Joseph F. Garr, Jr., APLC**
**Post Office Drawer 2069**
**Lafayette, LA 70502-2053**
**(337) 233-3185**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Mazella Shahan Flournoy**

**Douglas K. Williams**
**Kelsey A. Clark**
**Breazeale, Sachse & Wilson, L.L.P.**
**P. O. Box 3197**
**Baton Rouge, LA 70821-3197**
**(225) 387-4000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Our Lady of Lourdes Regional Medical Center**

**CHATELAIN, Judge.**

In this medical malpractice action, Mazella Shahan Flournoy (Plaintiff), the surviving mother of Niki Lynn Gannard (Gannard), appeals the trial court's judgment, granting defendant's Our Lady of Lourdes (OLOL) motion for summary judgment and dismissing Plaintiff's claims with prejudice as to OLOL. Finding Plaintiff failed to produce sufficient evidence to establish her ability to satisfy her evidentiary burden at trial on the elements of breach and causation, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

This litigation arises out of the treatment and care Our Lady of Lourdes Regional Medical Center, Inc. (OLOL) provided to Plaintiff's daughter, Gannard, following a motorcycle accident just before 3 a.m. on April 21, 2007. In her petition, Plaintiff alleges Gannard was an unhelmeted passenger on the motorcycle when an automobile, traveling in the opposite direction, attempted a left turn directly into the motorcycle's path. Upon impact, Gannard was thrown a distance of approximately 75 to 100 feet, resulting in severe injuries.

The medical records reflect neither the emergency medical service (EMS) nor Gannard ever advised OLOL that Gannard was not wearing a helmet at the time of impact, that she had suffered any trauma to her head, or that she lost consciousness. To the contrary, the Acadian Ambulance (Acadian) record indicates Gannard was wearing a helmet, she denied loss of consciousness, and no trauma was noted to the head. It was only subsequently revealed during litigation and through witness interviews that Gannard was, in fact, not wearing a helmet and had actually lost consciousness for a period of time before EMS arrived.

Immediately after the accident, Acadian transferred Gannard to the emergency room (ER) at OLOL. Upon her arrival in the ER, Gannard was not

wearing a helmet, but she was conscious and coherent and showed no visible external trauma to her head, according to the emergency room records. At the time of Gannard's admittance to the ER, the records charted a Glasgow Coma Scale (GCS) of fifteen, which is the highest score for alertness or consciousness.[1]

After the nursing staff and Dr. Gregory S. Thompson, the ER physician, examined Gannard, she was admitted to OLOL's Intensive Care Unit (ICU) for severe orthopedic injuries, including an open book fracture to her pelvis, comminuted fractures to both lower extremities, and an undisplaced right medial malleolar fracture. CT scans of her abdomen, pelvis, and chest were ordered, with Dr. Keith Colomb (Dr. Colomb), a general surgeon, then assuming her care. He, along with Dr. Barry Henry (Dr. Henry), an orthopedic surgeon, first observed Gannard while she was undergoing the CT scans. In his deposition, Dr. Colomb explained that, although a technician asked whether he wanted a CT scan of Gannard's head performed at that time, he rushed Gannard into surgery because her condition had become emergent when the injuries to her pelvis and lower extremities caused a life-threatening drop in blood pressure due to active internal hemorrhaging. As a result of those injuries, Dr. Henry immediately performed two orthopedic surgeries on Gannard, one to repair the open book fracture of the pelvis and the other to repair the three fractures to the lower extremities. Gannard remained intubated during and between both surgeries. Following the orthopedic surgeries by Dr. Henry, she was admitted to the intensive care unit at OLOL for post-surgical care and monitoring.

---

[1] The Glasgow Coma Scale is "a standardized system for assessing response to stimuli in a neurologically impaired patient; reactions are given in a numerical value in three categories (eye opening, verbal responsiveness, and motor responsiveness), and the three scores are then added together. The lowest values are the worst clinical scores." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1697 (31st ed. 2007). As depicted in the GCS used in the charts herein, a score of three is the lowest, whereas a score of fifteen is the highest.

The following morning, April 22, 2007, Dr. Colomb visited with Gannard during his morning rounds sometime between 6:00 and 7:00 a.m. Thereafter, Nurse Bambi Rayburn (Nurse Rayburn) did an assessment at 8:00 a.m., during which Gannard indicated she had been having a headache for hours and describes the headache as "sharp" and "constant." Gannard's medical chart also documented she was vomiting. The medication follow-up at 8:46 a.m. indicated Gannard was "[n]o longer complaining of pain" and her pain scale was "0" on a 10 scale of intensity after she had been given "Meperidine (Demerol)" for "[h]eadache[.]"[2] The noon assessment documented a pain scale of "3" and again Gannard described her headache as "sharp" and "constant" for "hours" in duration. The next assessment at 4:00 p.m. charted a pain scale of "5", and at this point, Nurse Rayburn applied cold therapy and called Gannard's treating anesthesiologist, Dr. Timothy Faul (Dr. Faul), who prescribed Morphine. At 4:54 p.m., Nurse Rayburn followed up with Dr. Faul on the Morphine that was administered and noted no improvement with a pain scale of "8".

At 7:00 p.m., Nurse Rayburn charted that Gannard continued to complain of severe headaches and that Dr. Faul prescribed one intravenous dose of Toradol. The review of systems performed by Nurse Marleen B. Oldenburg (Nurse Oldenburg) at 8:00 p.m. charted a pain scale of "7". After Nurse Oldenburg contacted Dr. Colomb at 8:06 p.m., he faxed an order for Esgic. Nurse Oldenburg explained that Gannard and her mother thought the headache may have been related to caffeine withdrawal and that Esgic had worked in the past for such complaints.

---

[2] The OLOL's Medication Reconciliation Orders printed on April 21, 2007, at 3:46 p.m., documented that Dr. Colomb prescribed the meperidine to be adiminstered in the designated dosages as needed.

3

At 12:00 a.m. on April 23, 2007, Nurse Oldenburg again assessed Gannard and charted a pain scale of "0". The 4:00 a.m. review charted a pain scale of "6" with severe vomiting and a headache that was "sharp" and "constant" for "hours" in duration. When Nurse Casey L. Reeves (Nurse Reeves) performed a review of systems at 8:00 a.m., he noted a pain scale of "0", but also noted a headache that was "sharp" yet "intermittent" in duration and that Gannard was "not able to give pain number" in relation to where the pain was "[r]adiating to[.]" The records showed a GCS score of "15" at this time. At 10:00 a.m., Nurse Reeves noted Gannard complained of a headache:

> Points to forehead but unable to give pain scale number. [Patient] cursing & stating her head hurts. Gave 1 Esgic tab [per orders]. [Patient] spit out pill while still cursing & stating "give me something for my head." Morphine PCA in progress. [Patient] did swallow pill w[ith] sip of water.

Forty minutes later, at 10:40 a.m., Gannard screamed loudly, and Nurse Reeves charted:

> RN went immediately into room to evaluate situation. Found [heart rate] 161, [blood pressure] 200's, small amount white foamy secretions around mouth, [patient] unresponsive. RN called for help. A.Autry, RN & B.McWhorter, RN responded to call for help. O[xygen] sat[uration] 98%. Pulled [patient] up in bed. RNs remaining at bedside.

By 10:42 a.m., Gannard was unresponsive to commands, and her GCS score dropped to "11".

Immediately thereafter, Dr. Colomb was paged at 10:45 a.m. Dr. Colomb ordered a CT scan and neurosurgical consult "stat" at 10:50 a.m., at which point Dr. Patrick Juneau (Dr. Juneau), a neurosurgeon, was paged. At 11:11 a.m., a CT scan of the head was performed, depicting a left scalp hematoma and diffused edema throughout the brain; "tiny" hemorrhages were noted as well. No cranial fracture was seen.

At 12:00 p.m., Dr. Juneau ordered that a Ventrix monitor be placed on Gannard to determine and monitor her intracranial pressure (ICP). Although OLOL had two such monitors, both malfunctioned. Nurse Reeves charted that Gannard was comatose with a GCS score of "3". Approximately three hours later, OLOL received a functioning Ventrix monitor from Lafayette General Medical Center, which Dr. Juneau installed. At 8:00 p.m., the monitor showed Gannard's ICP at 86 mmHg.[3] At approximately 10:45 a.m., on April 24, 2007, Gannard was pronounced dead.

Thereafter, Plaintiff filed a medical malpractice complaint against Dr. Colomb and OLOL (collectively defendants) on April 9, 2008. The medical review panel issued its unanimous decision on May 11, 2009, finding:

> *The evidence does not support the conclusion that either Dr. Keith A. Colomb or Our Lady of Lourdes Regional Medical Center failed to meet the applicable standard of care as charged in the complaint.*

This opinion is based upon the following:

> *Ms. Gannard presented to Our Lady of Lourdes via ambulance in the early morning hours of April 21, 2007. She had suffered severe lower extremity and pelvic injuries as a result of a severe motorcycle accident. She was quickly and thoroughly evaluated in the emergency department and appropriately admitted to the intensive care unit for care of her injuries. While many/most patients with Ms. Gannard's injuries would have had an initial CT scan of the head/brain, it is not outside the standard of care to omit the scan in a patient with normal neurologic status and no evidence of a head injury. It is repeatedly documented that Ms. Gannard had no evidence of head injury in her chart. It is well documented that Ms. Gannard had an essentially normal neurologic status until she began to abruptly change in the early morning hours of 4/23/07. At that point Ms. Gannard not only changed her neurologic status, but also her respiratory status. Her subsequent course was ongoing worsening with resultant death. Based on the*

---

[3] The symbol "mmHg" denotes a millimeter of mercury. Normal ICP will range from 1 to 20 mmHg. *Intracranial pressure monitoring*, MEDLINEPLUS (April 26, 2017, 5:22 p.m.), https://www.medlineplus.gov/ency/article/003411.htm.

*evidence in her chart, this change, occurring more than 48 hours after her initial injury, is most consistent with Fat Embolization Syndrome (altered neurologic status, hypoxia, low platelets, chest x-ray changes consistent with ARDS, multiple long/large bone fractures with surgery). It would be exceedingly rare for a patient with a severe traumatic brain injury to have remained lucid and neurologically normal for this length of time after such an injury.*

*The nursing staff and other staff at Our Lady of Lourdes also performed within the expected manner and followed the physician orders appropriately.*

Thereafter, Plaintiff filed the instant suit against defendants on July 30, 2009, asserting a survival action, a wrongful death action, and an action "for the loss of chance of survival of her daughter" resulting from defendants' malpractice. Specifically as to OLOL,[4] Plaintiff alleged:

Petitioner avers that a further sole and proximate cause of the death of her daughter was the fault and/or negligence and/or failure to adhere to the appropriate standard of care on part of defendant, Our Lady of Lourdes Hospital; said breach of the applicable standard of care consisting of the following non-exclusive particulars:

(a) Failure to obtain an accurate history;

(b) Failure to timely observe and/or report symptoms of a closed head injury;

(c) Failure to timely observe and/or diagnose symptoms of a closed head injury;

(d) Failure to timely determine the cause of the continued complaints of headaches and/or nausea;

(e) Failure to have a functioning Ventrix monitor on premises; and

(f) Other acts failing to comply with the applicable standard of care which may become known through discovery or shown at the trial of this matter.

---

[4] Because the summary judgment at issue before us only involves OLOL, Plaintiff's allegations against Dr. Colomb are not pertinent to our analysis.

6

Over nine years after Gannard's accident, OLOL filed its motion for summary judgment on the basis that Plaintiff could not satisfy her burden of proof on the claims asserted against OLOL at trial, namely, Plaintiff failed to produce expert evidence to establish that OLOL breached the standard of care and/or caused Gannard's death. OLOL attached thereto the following exhibits in support of its position:

(1) Plaintiff's Petition for Damages;

(2) Affidavit, expert report, and deposition of Dr. Christopher J. Chaput (Plaintiff's expert neurosurgeon);

(3) Gannard's Certified Medical Records from OLOL;

(4) Affidavit, expert report, and deposition of Dr. Donald Breech (Plaintiff's expert orthopedic surgeon); and

(5) Affidavit of the medical review panel chairman, David S. Cook, with attached medical review panel opinion and oaths of panel members.

Alternatively, OLOL also filed a motion for partial summary judgment on the basis that Plaintiff could not satisfy her burden of proof with regard to the wrongful death claims against the hospital. In support thereof, OLOL attached: (1) Plaintiff's petition and (2) excerpts from the depositions of Drs. Breech and Chaput.

Plaintiff opposed both motions, attaching the following exhibits:

(1) Excerpts of Gannard's medical records, including Acadian's records;

(2) Excerpts of Dr. Colomb's deposition;

(3) Excerpts of Dr. Chaput's deposition;

(4) Excerpts of Dr. Juneau's deposition;

(5) Opinion Letter of Dr. Alan J. Appley (neurosurgeon);

(6) Excerpts from Nurse Oldenburg's deposition;

(7) Excerpts of Dr. Breech's deposition; and

(8) Plaintiff's petition

The trial court heard the motions on October 31, 2016, just five weeks before trial was scheduled to commence. Ruling from the bench, the trial court, finding "general issues of material fact[,]" denied the motions. Thereafter, the certified Minute Entry from November 2, 2016, directed:

> The court minutes of October 31, 2016 in the before-captioned case should read as follows:
>
> > Upon reconsideration of oral arguments and reviewing the evidence presented, the Court finds that the mover presented uncontested medical testimony to support its position. The present action was not a case of obvious negligence, and therefore expert testimony was required to show the mover's fault, in accordance with Schultz v. Guoth, 20100343 (La. 1/19/11), 57 So.3d 1002. Therefore, the Plaintiff cannot meet her burden of proving the essential elements of her medical malpractice case. Accordingly, the Court grants the mover's motion for summary judgment. The mover's motion for partial summary judgment is now moot. Judgment in accordance with the ruling is to be signed upon presentation.

By judgment signed November 3, 2016, the trial court granted OLOL's motion for summary judgment, dismissing Plaintiff's claims against OLOL with prejudice. Plaintiff timely appealed.

## DISCUSSION

In brief to this court, Plaintiff assigns seven errors to the trial court judgment:

(1) The trial court committed reversible legal error, in granting summary judgment to the Appellee, by ignoring Appellant's competent summary judgment expert testimony indicating the standard of care that applies to Appellee's nursing staff under the facts of this case.

(2) The trial court committed reversible legal error, in granting summary judgment to the Appellee, by ignoring Appellant's competent summary judgment expert testimony indicating that Appellee, either independently and/or through the substandard acts of its employee nurses, breached the applicable standard of care.

8

(3) The trial court committed reversible legal error, in granting summary judgment to the Appellee, by imposing on Appellant a legally incorrect burden, namely, the burden to produce expert medical causation testimony at the summary judgment juncture of these proceedings.

(4) The trial court committed reversible error, in concluding no genuine issues of material fact exist, by ignoring and/or disregarding the competent sworn testimony of Appellant's medical expert witnesses. These medical experts testified that the failure of Appellee's nursing staff to properly report the increasing headaches of Appellant's deceased daughter, Niki Gannard, severely impacted Ms. Gannard's chance of overcoming her injuries.

(5) The trial court committed reversible legal error, in granting summary judgment to the Appellee, by misinterpreting and/or misapplying Louisiana law relating to the Appellee hospital's *respondeat superior* liability for the negligence of its employee nurses in the course and scope of their employment.

(6) The trial court committed reversible legal error by granting Appellee a complete summary judgment dismissal with prejudice, in derogation of Louisiana law, without providing Appellant an opportunity to pursue her loss of a chance of survival claim.

(7) The trial court committed reversible error by basing its grant of summary judgment in this matter on *Schultz v. Guoth*, infra, which is factually and procedurally distinguishable from the above-captioned matter.

In response to Plaintiff's appeal, OLOL raises the single issue of whether the trial court properly granted summary judgment when (1) Plaintiff "failed to submit any expert reports expressing any opinion that the hospital breached the standard of care," (2) Plaintiff's "experts admitted that they had formulated no opinions that the hospital breached any standard of care," and (3) Plaintiff's "experts testified that no action of the hospital played any role in the patient's death."

After careful study and review of the memoranda and supporting exhibits attached thereto, we agree with the trial court that the resolution of this matter

centers upon whether Plaintiff met her burden of proof to survive OLOL's motion for summary judgment.[5]

### *Standard of Review*

An appellate court reviews a motion for summary judgment *de novo*, using the identical criteria that govern the trial court's consideration of whether summary judgment is appropriate. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So.2d 880. Therefore, just like the trial court, we are tasked with determining whether "the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3).

Initially, the burden of producing evidence at the motion hearing is on the mover, "who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case." *Schultz v. Guoth*, 10-343, p. 6 (La. 1/19/11), 57 So.3d 1002, 1006. Procedurally, therefore, the court's first task is to determine whether the moving party's motion, memorandum, affidavits, and supporting documents are sufficient to resolve all material factual issues. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730. "To satisfy this burden, the mover must meet a strict standard of showing that it is quite clear as to what is the truth and that there has been excluded any real doubt as to the existence of a genuine issue of material fact." *Indus. Sand & Abrasives, Inc. v. Louisville & Nashville R.R. Co.*, 427 So.2d 1152, 1154 (La.1983).

In making this determination, the court must closely scrutinize the mover's supporting documents, while treating those submitted by the adverse party

---

[5] Because the resolution of this issue is dispositive, we pretermit discussion of all other issues raised in this appeal.

indulgently. *Smith*, 639 So.2d 730. Moreover, because the moving party bears the burden of proving the lack of a material issue of fact, we must view all inferences drawn from the underlying facts in a light most favorable to the adverse party. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342 (La.1991).

If we determine that the moving party has met this onerous burden, the burden then shifts to "the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." La.Code Civ.P. art. 966(D)(1). "At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial." *Samaha*, 977 So.3d at 883.

As our courts have long held, "summary judgment may be granted when reasonable minds must inevitably conclude that the mover is entitled to judgment on the facts before the court." *Smith*, 639 So.2d at 752. However, "[o]nce the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Samaha*, 977 So.3d at 883.

We further note that the summary judgment procedure is favored and, by law, shall be construed to accomplish the ends for which it was designed: "to secure the just, speedy, and inexpensive determination of every action[.]" La.Code Civ.P. art. 966(A)(2). With these principles in mind, we turn now to OLOL's motion for summary judgment.

***Medical Malpractice***

11

The motion for summary judgment at issue herein arises in the context of a suit for medical malpractice. To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

La.R.S. 9:2794(A). Nurses who perform medical services are subject to the same standards of care and liability as physicians. *Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr.*, 564 So.2d 654 (La.1989). Thus, in a medical malpractice action against a hospital, the plaintiff must prove that the hospital, through its nurses or staff, caused the injury when it breached its duty:

A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.

*Hunt v. Bogalusa Cmty. Med. Ctr.*, 303 So.2d 745, 747 (La.1974).

Expert testimony is generally required to establish the applicable standard of care, its breach, and causation. *Samaha*, 977 So.2d 880. The only recognized

exception is where the negligence is so obvious that a layperson can infer negligence without the guidance of expert testimony:

> We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA–R.S. 9:2794's requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant's fault and the injury alleged.

*Pfiffner v. Correa*, 94-924, 94-963, 94-992, pp. 9-10 (La. 10/17/94), 643 So.2d 1228, 1234.

Our supreme court has recognized the need for expert testimony on the standard of care, breach thereof, and causation in circumstances involving the conveying of information and lab results to a physician by a hospital's nursing staff. *Johnson v. Morehouse Gen. Hosp.*, 10-387, 10-488 (La. 5/10/11), 63 So.3d 87. Even in *Pfiffner*, the supreme court held that a causal nexus between delayed treatment and a patient's death is not obvious and requires expert testimony, either from plaintiff's experts or defendant's experts, to establish that the health care provider breached the applicable standard of care and that this breach caused the patient's death or loss of a chance of survival. *Pfiffner*, 643 So.2d 1228.

Significantly, the case now before us is not one of obvious negligence which would require no expert testimony to prove the elements of Plaintiff's malpractice claim. Whether the hospital breached the applicable standard of care and whether that breach caused Gannard's injury will turn on complex medical issues involving emergency care and intensive care protocols, trauma diagnostics, orthopedic and

surgical intervention, and neurological evaluations, some of which are subspecialties, which, by their very nature, are not within the purview of an average nurse or physician, much less the average layperson. The medical records themselves even contain medical terms and shorthand not within the lexicon of the average layperson, which could very well require expert translations. Thus, we agree with the trial court that the issues herein are simply beyond the province of a layperson to assess without the aid of expert testimony, which in turn would require the parties, to either succeed on or survive summary judgment, to produce such evidence.

As the record shows, OLOL produced expert evidence to support its position through the medical review panel opinion[6] and oaths of the physician panel members, which all concluded: "*The evidence does not support the conclusion that . . . Our Lady of Lourdes Regional Medical Center failed to meet the applicable standard of care as charged in the complaint.*" OLOL also produced the reports of Plaintiff's experts, Drs. Breech and Chaput, neither of which contained any reference whatsoever to the standard of care for hospitals or nurses or whether any such standards were breached by OLOL, much less an opinion on causation. Through the discovery depositions of both expert physicians, which OLOL likewise submitted, it was further established that neither physician was an expert on the standard of care for nurses and that neither physician developed any opinion that, based on the medical record, any nurses at OLOL breached the standard of care or caused Gannard's death.

Dr. Breech specifically stated that he was not qualified to testify as to whether there was any intervention that could have been done to prevent

_____

[6] The opinion of the medical review panel "is admissible, expert medical evidence that may be used to support or oppose any subsequent medical malpractice suit." *Samaha*, 977 So.2d at 890; *see also Galloway v. Baton Rouge Gen. Hosp.*, 602 So.2d 1003 (La.1992).

Gannard's death, and he never expressed any opinion that OLOL breached any standard of care. He did, however, opine that it was appropriate for nursing staff to call or contact the treating physician if there were any changes to a patient's condition or if the patient was not responding, and that it would be below the standard if the nursing staff did not contact the physician. Notwithstanding, he also conceded that, if the record reflected the nurses made such contact, then the duty to act would have fallen on the doctor.

Similarly, Dr. Chaput explicitly acknowledged that he could not say that any action or inaction on the part of OLOL played any role in Gannard's ultimate outcome. As to standard of care, Dr. Chaput did respond to hypothetical questions posed by Plaintiff's counsel based on random and incomplete facts taken from Gannard's medical records, which skipped and/or omitted hours of entries in Gannard's nursing chart. He even expressed an opinion as to substandard care under the selective facts presented. However, when presented with the complete facts and hour-by-hour chart entries, including the improvement of her headache complaints and the communications with Dr. Faul and Dr. Colomb, Dr. Chaput testified that the nurses did exactly what was expected of them and did not breach the standard of care to which he had previously alluded.

Dr. Chaput also testified that nurses are not supposed to contact a treating physician for every headache and discussed Dr. Colomb's standing order for acetaminophen,[7] which indicated headaches, given Gannard's circumstances, were anticipated. As for the failure to have working Ventrix monitors, Dr. Chaput explicitly stated in his deposition that Gannard's condition was grave by the time

_____

[7] Although the medical records do not indicate that Gannard complained of headaches or head pain at the time of her admission to OLOL, Dr. Chaput addressed the order set Dr. Colomb authorized which included "acetaminophen p.r.n. for headache." As Dr. Chaput explained, "It's not an indication that the patient had [a] headache at that time." In his deposition, Dr. Chaput further acknowledged that such an order is simply a doctor's permission to a nurse to administer acetaminophen if the patient complains of headaches.

15

the gauges were needed and, therefore, that their malfunction played no role in the final outcome.

While both Dr. Breech and Dr. Chaput opined the medical care fell below the standard of care expected, their opinions were based on the treatment, or lack thereof, provided by the physicians, not the nursing or hospital staff. Their primary concerns were (1) the delay in ordering and performing a CT scan of Gannard's head and (2) the corresponding failure to observe or monitor any neurological changes and address the underlying cause of Gannard's headaches. However, both physicians agreed that nurses do not have the authority or ability to order CT scans or to diagnose the cause of neurological complaints or abnormalities. Finally, all the medical evidence consistently showed Gannard's death was directly caused by injuries sustained in the motorcycle accident by an unhelmeted passenger thrown 75 to 100 feet, not from any action or inaction on the part of medical providers at OLOL.

Through this uncontradicted medical evidence, OLOL supported its position that Plaintiff could not prove the essential elements for her medical malpractice claim. Upon this prima facie showing, the burden shifted to Plaintiff to "produce evidence from a medical expert to establish a breach of the standard of care, as well as causation[]" sufficient to show the existence of a genuine issue of material fact or that OLOL was not entitled to judgment as a matter of law. *Shultz*, 57 So.3d at 1009.

As expert evidence, Plaintiff attached excerpts from the deposition testimony of Drs. Breech and Chaput given in response to the hypothetical questions asked by Plaintiff's counsel, which, as previously noted, omitted and/or skipped hours of charted nursing care. "Mere speculation will not defeat a motion for summary judgment, and conclusory allegations, improbable inferences, and

16

unsupported speculation are insufficient to support a finding that a genuine issue of material fact exists." *Kinch v. Our Lady of Lourdes Reg'l Med. Ctr.*, 15-603, pp. 7-8 (La.App. 3 Cir. 12/9/15), 181 So.3d 900, 905. Therefore, this evidence is insufficient to defeat OLOL's motion for summary judgment, particularly since both experts explicitly stated they had no criticism of OLOL or its nurses based on their review of Gannard's medical records.

Plaintiff also relied on the deposition testimony of Dr. Colomb and Nurse Oldenburg, as well as the testimony and opinions of Drs. Breech, Chaput, and Appley to demonstrate the existence of five alleged issues of material fact. The jurisprudence has well-recognized that while there may be some genuine issues in dispute, those same issues are not material if their existence or nonexistence is not "essential to plaintiff's cause of action under the applicable theory of recovery." *S. La. Bank v. Williams*, 591 So.2d 375, 377 (La.App. 3 Cir. 1991), *writ denied*, 596 So.2d 211 (La.1992). Simply, the alleged disputed issues are insufficient to establish breach or causation under Plaintiff's theory of medical malpractice. Moreover, "it is incumbent upon the adverse party to present specific facts, showing that there is a genuine issue for trial." *Id.* Mere allegations of dispute or artful phrasing of issues will not suffice.

First, Plaintiff asserts it is disputed whether the nursing staff obtained and documented an accurate history upon Gannard's presentation to the ER. However, apart from stating nurses should obtain and document an accurate history, Plaintiff has presented no medical evidence as to what that "standard" actually entails or how the nursing staff failed to meet that "standard." Moreover, simply stating there is a dispute is not dispositive when the charting clearly indicated, relevant to the alleged trauma herein, that (1) Acadian reported Gannard was wearing a helmet, (2) both EMS and Gannard reported she did not lose consciousness, (3) Gannard was

17

not wearing a helmet when she arrived in the ER, and (4) thorough physical and cognitive examinations were performed and charted. Moreover, contrary to her present position, Plaintiff throughout the record, in her criticism of Dr. Colomb's care, pointed to the inconsistencies with the ER nurses' observation of injuries to Gannard's upper torso—acknowledging the nurses' charted examinations—and Dr. Colomb's statement that Gannard had no visible signs of trauma above her waist.

Next, Plaintiff argues there is a factual dispute as to whether OLOL's nurses or staff negligently failed to timely recognize the need for a CT scan and/or failed to do what was necessary to make sure a CT scan was performed. While the experts do dispute whether the delay in ordering a CT scan was within the standard of care, that dispute is immaterial to the issues herein. All the experts agreed the ordering of CT scans and the diagnosing of neurological complaints fall on the physician, in this case Dr. Colomb, not the nursing or hospital staff.

Plaintiff then points to the dispute regarding whether Dr. Colomb was informed of the duration and severity of Gannard's headache complaints prior to April 23, 2007. Dr. Colomb testified in his deposition he was not informed of Gannard's complaints, but had he been so informed, he would have taken action to address those complaints or investigate their cause. Nurse Oldenburg testified in her deposition that she did contact Dr. Colomb on the night of April 22, 2007, to discuss Gannard's headaches and request for Esgic. The record shows Dr. Colomb ordered the Esgic around 8:00 p.m. that evening. This dispute, however, is immaterial as (1) Gannard's medical records charted the steps taken by the nursing staff in first conveying Gannard's complaints to Dr. Faul and then to Dr. Colomb, accompanied by their corresponding prescriptions/orders for Morphine, Toredol, and Esgic, and, more importantly, (2) there is no medical testimony that, based on the medical records, any action or inaction by the nursing staff breached the

18

applicable standard of care or contributed to or hastened Gannard's death. Dr. Colomb's self-serving testimony, though admittedly critical of the nursing staff, nevertheless fails to set forth the applicable standard of care specific to the nurses herein or a causal link between Gannard's death and any specific action or inaction of the nursing staff.

Another dispute Plaintiff notes concerns the mechanism of Gannard's death, *i.e.*, the specific physiological disturbance in bodily function that actually led to the cessation of life. Drs. Breech, Chaput, and Juneau opined Gannard died from increased ICP most likely attributed to a closed-head injury sustained in the accident, while Drs. Colomb and Appley, as well as the medical review panel, opined Gannard died from FES[8] resulting from the fracture of her pelvis and lower limbs. This dispute is rendered immaterial herein given the lack of any expert evidence connecting Gannard's death or loss chance of survival to any action or inaction on OLOL's part and the uncontroverted, unanimous expert evidence that, regardless of the mechanism, the cause of Gannard's death was trauma—either to her head or to her pelvis and lower limbs—sustained in the motorcycle accident.

Finally, Plaintiff claims there is a dispute as to the amount of the lost chance of survival resulting from the failure of OLOL and/or its nurses to meet the applicable standard of care. Once again, this alleged dispute is merely one of semantics given the lack of any evidence connecting Gannard's death or survival to any action or inaction on the part of OLOL and its staff as well as the lack of expert evidence regarding the applicable standard of care and breach thereof based on the medical record.

_____

[8] FES or Fat Embolism Syndrome "occurs when an embolism caused by fat enters the circulation, especially after fractures of large bones." DORLAND'S, at 613.

Here, Plaintiff was required to present medical evidence to establish that OLOL's actions fell below the standard of care and caused Gannard's injuries. Without this evidence, Plaintiff failed to show that she will be able to carry her burden of proof at trial. Accordingly, we find the Plaintiff did not satisfy her burden of persuasion with regard to the defendant's motion and, thus, she has failed to establish a genuine issue of material fact to defeat summary judgment or that OLOL is not entitled to judgment as a matter of law.

Our review of the motion for summary judgment, the opinion of the medical review panel, the medical records, the affidavits of Drs. Breech and Chaput, and the deposition testimony of Drs. Breech, Chaput, and Colomb, all convince us that OLOL is entitled to summary judgment as Plaintiff failed—almost a decade after the accident and five weeks prior to trial—to present any expert evidence that any action of the hospital staff either decreased Gannard's chance of survival or contributed in any way to her death. Accordingly on the evidence submitted, OLOL is clearly entitled to judgment as a matter of law.

## DECREE

For the reasons discussed above, we affirm the judgment of the trial court, granting the motion for summary judgment filed by Our Lady of Lourdes Regional Medical Center and dismissing Plaintiff's claims with prejudice with prejudice as to Our Lady of Lourdes Regional Medical Center. Costs are assessed to Plaintiff, Mazella Shahan Flournoy.

**AFFIRMED.**

20

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

**MAZELLA SHAHAN FLOURNOY**

**VERSUS**

**OUR LADY OF LOURDES REGIONAL
MEDICAL CENTER, ET AL.**

**Conery, J. dissents and assigns reasons.**

This is a close case.  In my view, close cases such as this should not be dismissed by Summary Judgment.  A young lady died as a result of alleged failure to timely diagnose and treat a concussion she sustained in a vehicle/motorcycle collision.  According to defendant, hospital's statement of uncontested material facts, "As a result of the accident, Ms. Gannard was thrown a distance of approximately 75-100 feet, which caused severe orthopedic injuries."  She landed on pavement and was not wearing a helmet at the time of the accident.  It doesn't take a medical or nursing expert to suspect that Ms. Gannard likely sustained head trauma and/or a concussion.

This case was pending in the trial court for over nine (9) years.  When it first came up for hearing on hospital's summary judgment motion, the trial court denied the motion.  A few days later, the trial court issued a minute entry changing the ruling and granted hospital's motion for summary judgment.  No Reasons For Judgment were filed and no analysis of the evidence was undertaken to support the conclusion that there were no material facts in dispute.  The majority finds no genuine "issue material facts exists" and affirmed the trial court's ruling.  This young lady's family deserves to have this case decided by a jury.  I respectfully

dissent for the reasons which follow.

First and foremost, I would find that there is a genuine issue of material fact as to whether the failure of the intensive care nurses to correctly report decedent's headache complaints to her treating physicians led to a delay in treatment of a concussion which caused her intracranial pressure to build, eventually causing her death.

There is no question that Ms. Gannard sustained severe head trauma in the underlying automobile/motorcycle collision. In fact, in OLOL's summary judgment motion, the hospital admitted that the following facts were undisputed:

1. While riding as a guest passenger on a motorcycle, Niki Lynn Gannard was involved in an accident on April 21, 2007 in which another car traveling in the opposite direction attempted a left turn directly into the path of the motorcycle.

2. As a result of the accident, Ms. Gannard was thrown a distance of approximately 75-100 feet, which caused severe orthopedic injuries. Ms. Gannard was not wearing a helmet at the time of the accident.

3. Ms. Gannard was transferred via ambulance to OLOL immediately after the accident, and her treatment was assumed by Dr. Colomb.

Plaintiff retained two medical experts, Dr. Chaput and Dr. Breech, both of whom reviewed all of the hospital and medical records, all of which were introduced in evidence for summary judgment purposes. In addition, plaintiff filed lengthy affidavits from both of these two doctors, each of whom were well qualified and had extensive experience in emergency room and ICU protocol. In its brief before this court, plaintiff's counsel cited numerous pages of the hospital records demonstrating that Ms. Gannard complained of severe headaches to the staff in ICU. There is a material issue of fact as to whether the severity, duration and intensity of those headaches, noted in the record and cited by plaintiff's

counsel in brief, were timely and properly relayed to Ms. Gannard's treating physician, Dr. Colomb.

Dr. Chaput and Dr. Breech were later deposed by defendant hospital and their depositions were introduced both in support of and in opposition to the hospital's motion for summary judgment. Both attorneys asked the doctors for opinions based on their interpretation of what they felt the evidence would establish at trial.

When considering the affidavits from Dr. Chaput and Dr. Breech, rendered after review of <u>all</u> the medical records without qualifying hypothets by two excellent attorneys, there clearly are expert medical opinions from both doctors that the hospital intensive care nurses breached the standard of care, which led to a loss chance of survival of the patient.

Ms. Gannard was fully conscious and able to communicate when she was brought to the emergency room at Lourdes. Likewise, she was fully conscious post- surgery while in intensive care for two days before she died. I would respectfully suggest that, at minimum, there are questions of material fact as to whether the hospital personnel in both the ER and Intensive Care Unit promptly and correctly ascertained sufficient history from Ms. Gannard as to the source of her headaches, and whether the intensive care nurses promptly and correctly reported the severity and intensity of Ms. Gannard's headaches and deteriorating condition to her attending physician, Dr. Colomb. Dr. Colomb testified by deposition that they did not:

> Q. Were you ever made aware of conversations between Ms. Gannard's family, and in particular her mother, Ms. Flournoy, who was here earlier, and the nursing staff about persistent headaches that entire first day following the orthopedic surgeries?

MR. JUDICE:  Again, on the 22nd?

MR. STRENGE:   The 22nd, yes.

A.    No, sir.

    . . . .

MR. STRENGE:  (CONTINUING)

Q.    Let me be a little bit more specific and add to that general premise that I've just set forth is that it's my impression based upon both the - - some of the nursing entries as well as information provided to me by the family that Ms. Gannard had persistent headaches that entire day after coming out of the anesthesia from her orthopedic.  She was also given medicine for nausea.  I don't know if you prescribed that or if somebody else would have done that.  But knowing that or had you known that - - let me put it that way - - would you have ordered any particular studies of any kind to further evaluate the cause of the headaches?

A.    If some nurse would have called me to tell me that she was having severe, persistent headaches throughout the day, I would have ordered a CT scan of her head at that point, but I never got that, not one time.

MR. JUDICE:     Never got "that"?

A.    I never got that information that she had severe, persistent headaches throughout the day.  The only time I ever got a call about any headache was at 8:00 on April the 22nd, eight p.m. April the 22nd, saying that she had a mild headache.

I spoke with the nurse, and I said, "Well, how is she doing?" and she said, "She's doing fine."  She said that she had been visiting with her family throughout the day and was stable, awake and alert, she had no neurological findings and that her blood pressure and everything was stable.  And that was the only thing I got, was that she had a mild headache.  And, in fact, the nurse told me that she drank a lot of coffee and thought that it might have been related to caffeine withdrawal.

    . . . .

Q.    So to basically sum up, April 22nd you saw Ms. Gannard one time early in the morning; you had several calls from the nurses, as we've described - - I'm not going to go through them

individually - - but only one of those calls, you're telling me, was there any mention of a headache to you by the nursing staff at Our Lady of Lourdes Hospital?

MR. JUDICE: Object to the form of the question. You can answer it.

A.     Correct. There was only one call about a headache.

MR. STRENGE: (CONTINUING)

Q.     And you said it was described as a mild one at that?

A.     Correct.

One of the nurses on duty admitted that when she spoke with Dr. Colomb at 8:00 p.m. on April 22, she reported only that the patient and her family were concerned that the severe headaches related by Ms. Gannard to the nursing staff may have been due to caffeine withdrawal, and on that basis Dr. Colomb prescribed Esgic, as Ms. Gannard had told the nurses that she had taken that medication in the past.

Obviously, Ms. Gannard did communicate with the nurses and her family such that a proper history of severe head trauma from the collision could and should have been obtained. In fact, in many of the nurses' notes, there are continuing references of headaches that were constant in duration and severe in intensity. Dr. Colomb stated clearly that he was not told that his patient suffered headaches that were "severe in intensity and constant in duration," as reflected in many of the nurses' ICU notes.

Dr. Chaput, a neurosurgeon with over forty years' experience, testified by deposition that if a patient suffering from the severe trauma that Ms. Gannard had experienced, reported headaches for hours, constant in duration and severe in intensity, he would expect the **intensive care nursing staff** to have promptly

reported those symptoms to the treating physician, Dr. Colomb. Brain scans could then have been ordered, the patient intubated and cranial pressure closely monitored, along with repeat CT scans and close monitoring of the patient. A partial craniotomy could have been performed to ease the pressure on the brain.

Dr. Chaput noted that if a CT scan of the brain had been ordered early on, which Dr. Colomb said he would have done had the patient's symptoms been accurately obtained, recorded, and reported to him, this young lady would have had a chance at survival.

In his **initial sworn medical affidavit** filed of record in opposition to the motion for summary judgment, before the attorneys started asking hypothets based on their interpretation of the evidence in depositions, Dr. Chaput stated that he studied **all** of Ms. Gannard's medical records and noted in pertinent part:

> The first documented complaints by the patient of headache occurred on April 22, 2007 at 1053 hours. **Throughout that day,[1] the patient had persistent complaints of headache and required frequent medication.** By April 23, 2007 at 10:00 a.m., the headaches were documented to be of such severity that the patient pointed to her forehead cursing and unable to give pain scale rating of the headache. She could only verbalize "give me something for my head." Forty minutes later, a loud scream was heard coming from Ms. Gannard's room. Upon investigation, Ms. Gannard had white, foamy secretions around her mouth and was unresponsive. It is my opinion that this ictus represented transtentorial herniation due to massively elevated intracranial pressure. This had been developing from progressive cerebral edema as a result of the diffuse axonal injury of the brain. Closed head injury causes this brain swelling to peak 2-4 days after the initial injury. Diffuse cerebral edema regardless of etiology is an extremely serious and often fatal condition. The treatment of diffuse cerebral edema falls into three mutually interdependent spheres; first, supportive care, secondly, determination of the exact intracranial pressure and monitoring of this pressure continuously, and thirdly, extensive craniotomy to remove a large portion of the surrounding bone allowing the brain to expand without producing excessive intracranial pressure.

---

[1] The accident happened on April 21, 2007. The headaches were noted the very next morning following surgery.

**Failure to recognize the likelihood of diffuse axonal injury with this mechanism of trauma, that is, propulsion through the air for a distance of 75-100 feet with impact on pavement, precluded neurologic monitoring by means of sequential CT imaging of the brain and measurement/monitoring of intracranial pressure. Had this been accomplished, this extremely serious and indeed life-threatening condition could have been treated by surgical craniotomy. This procedure when performed before transtentorial herniation not only preserves life itself but also brain function.**

Associated facts in this case such as the development of progressive pulmonary edema, which is frequently associated with drastically increased intracranial pressure, further substantiate the presence of severe closed head injury. The sudden spell which occurred on 4/22/07 at 1053 hours was clearly the outward manifestation of a final shift of the brain due to this increased intracranial pressure and not an epileptiform seizure commonly associated with milder head injury. The clinical pattern of the brain edema as well as the pulmonary edema clearly represent traumatic brain injury and neurogenic pulmonary edema and not progressive fat embolization syndrome. Had the probability of severe intracranial injury been recognized, the fate of this young woman may have been quite different.
(Emphasis added).

Ultimately, Dr. Chaput testified at his deposition specifically as to loss chance of survival:

> **Q.**   **Doctor, given the history provided, ultimately we have a CT that does show the scalp hematoma, the increasing complaints of headache. Had that CT been done either at the time that she was admitted or at any time during that 24-hour period where she's having these increasing headaches, it certainly would have given Ms. Gannard a better chance of overcoming the injury?**
>
> MR. WILLIAMS:  Objection to form and foundation.
>
> MR. PALMINTIER:  Join.
>
> A.   Yes.

As with the report of Dr. Chaput, the sworn affidavit of Dr. Breech, also filed in evidence in opposition to the motion for summary judgment, contains his report dated June 1, 2009, again before any of the attorneys started asking

hypothets. After studying **all** of the medical records, his sworn report stated in pertinent part:

> She did **die from cerebral edema**, but the cause of **that cerebral edema was most likely a closed head injury, documented by the fact that when she finally got a CT scan of the head it showed a scalp hematoma and some subarachnoid hemorrhage. You don't get a scalp hematoma without having some head trauma and head trauma is the most common cause of cerebral edema**. Fat embolism causing cerebral edema has been reported but is an extremely rare finding. The only way to prove there is fat embolism in the brain that caused cerebral edema is with an autopsy finding showing fat globules in the arteries of the brain. This young lady did not have an autopsy. **My opinion is that she had some substandard medical care from the beginning, even probably starting with EMS as they gave inaccurate medical information, but once she arrived at the hospital she was not treated with the usual standard of care at all as regards to her overall injuries. Her orthopedic injuries were excellently well treated, but her admitting physician and the ER physicians should have immediately scanned her from head** to toe. This is a fairly common practice around the country in these types of situation. There is absolutely no way anyone can state with any degree of certainty that she had fat embolism in the brain. She definitely had cerebral edema, that is a given fact, and that is the ultimate cause of her demise.
> (Emphasis added).

The scalp hematoma was clear, objective evidence of head trauma. It was finally noted on the CT scan, as well as being visible on Ms. Gannard's scalp as she was finally prepared for a cranial pressure monitor. It is significant to note that the hospital had two cranial pressure monitors, neither of which was operable. The patient had to suffer for three - four additional hours before a proper monitoring device could be obtained from a nearby hospital. When a reading was finally taken, it showed severe cranial pressure that was literally "off the charts." Ms. Gannard's obvious hematoma could and should have been recognized either in the ER or ICU early on.

The majority points out that neither doctor testified in their depositions that the nursing staff violated the standard of care when asked difficult hypothetical

questions from the hospital's attorneys. However, Drs. Chaput and Breech were clear in their written affidavits filed as part of the summary judgment evidence.

In my view, it is inappropriate for our court to assign credibility and weigh the evidence in deciding a motion for summary judgment. For purposes of summary judgment, the hospital admitted as an uncontested material fact that "As a result of the accident, Ms. Gannard was thrown a distance of approximately 75-100 feet, which caused severe orthopedic injuries. Ms. Gannard was not wearing a helmet at the time of the accident." By ignoring or disregarding this admitted fact, plus the deposition testimony of Dr. Colomb that his review of the records showed complaints of headaches "severe in intensity and constant in duration" that were not reported to him by the nurses, the majority has erroneously, in my view, assessed credibility and weighed the evidence. Likewise, by accepting the deposition testimony of Drs. Chaput and Breech based on incomplete hypothets, and not taking into account their properly admitted summary judgment evidence in the form of their affidavits, the majority, in effect, has again weighed the evidence, assigned credibility and made a factual determination.

At a trial on the merits, the jury will determine credibility and weigh the evidence. The jury will hear testimony from the first responders, the eye witnesses at the scene of the collision, the ER personnel, the doctors involved in Ms. Gannard's care, and most, if not all, of the intensive care nurses. Likewise, family members are expected to testify about what they recall about Ms. Gannard's headaches and complaints while she was in intensive care.

All of the medical records will be introduced. Medical experts will then testify, along with co-defendant, Dr. Colomb. The lawyers will ask their hypothets based on their interpretation of the facts, as they did in deposition. But in the end,

in a case such as this, it will be up to the jury to assess credibility and weigh the evidence, decide the facts, and assign liability, if any, to the doctor and hospital. That's what jury trials are for. Indeed Louisiana Constitution Art.1 § 22 states, "All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights."

Though in some cases, where the facts are clear and undisputed, summary judgments may be proper. Here, the facts are in dispute. It doesn't take a medical or nursing expert to conclude that if Mrs. Gannard was thrown from a motorcycle 75-100 feet in the air and landed on pavement without a helmet, she likely would have sustained a concussion, as noted by both Doctors Chaput and Breech in their affidavits quoted infra and ultimately confirmed by the CT scan of the head that was ordered late – too late to give Ms. Gannard a chance at survival.

While it is certainly true that the legislature can enact and our courts can delineate how procedural rules can limit access to our courts in certain circumstances, such as Motions for Summary Judgment, those "procedural hurdles" should not be so high as to deprive a litigant of his constitutionally protected right to a trial by jury, whose very purpose is to resolve credibility and assign proper weight to evidence and testimony in conflict.

In my opinion, this case deserves to be heard by a jury, who will hear all the evidence, not dismissed before trial based primarily on hypothetical questions to well-meaning doctors by well-prepared attorneys.